In the Matter of SAMUEL S. KOENIG et al., Appellants, against EDWARD J. FLYNN, as Secretary of State, et al., Respondents.

(Argued January 21, 1932; decided February 9, 1932.)

*Abraham S. Gilbert* and *Benjamin L. Fairchild* for appellants. The Legislature in dividing the State into congressional districts exercised an administrative or political function pursuant to the provisions of section 4, article I of the Constitution of the United States. It did not exercise a law-making function. (*People ex rel. Carter* v. *Rice*, 135 N. Y. 473; *People ex rel. Smiley* v. *Holm*, 238 N. W. Rep. 494; *Richardson* v. *McChesney*, 128 Ky. 363.) The division of the State of New York into congressional districts was validly done by the Legislature by concurrent resolution pursuant to the provisions of section 4, article I of the Constitution of the United

States. (*Hawke* v. *Smith*, 253 U. S. 22; *McPherson* v. *Blacker*, 146 U. S. 1; *Behan* v. *People*, 17 N. Y. 516; *Mangam* v. *City of Brooklyn*, 98 N. Y. 585; *Cherokee Nation* v. *Georgia*, 5 Pet. 1; *Hood Rubber Co.* v. *Comm. of Corp.*, 167 N. E. Rep. 670; *Pine* v. *Commonwealth*, 121 Va. 812; *Clifford* v. *West Hartford Creamery Co.*, 153 Atl. Rep. 205; *Lewellyn* v. *Harbison*, 31 Fed. Rep. [2d] 740; *Matter of Kirkstall Brewery Co.*, 5 Ch. Div. 535; *Rex* v. *Poor Law Commrs.*, 6 A. & E. 56; *Courtauld* v. *Legh*, L. R. 4 Ex. 126.) There being no doubt as to the meaning of the word " Legislature " as used in the Constitution of the United States, resort cannot be had to the rule of practical interpretation. (*United States* v. *Sprague*, 282 U. S. 716; *Newell* v. *People*, 7 N. Y. 9; *People* v. *Rathbone*, 145 N. Y. 434; *Brown* v. *City of New York*, 213 App. Div. 206; 241 N. Y. 96; *Louisville & Nashville R. R. Co.* v. *Kentucky*, 161 U. S. 677; *People* v. *Tremaine*, 252 N. Y. 27.) The clear meaning of the word " Legislature " as used in section 4, article I of the Constitution of the United States is not and cannot be changed by resort to the rule of practical construction. (*Wendell* v. *Lavan*, 246 N. Y. 116; *People* v. *Rathbone*, 145 N. Y. 434; *Newell* v. *People*, 7 N. Y. 9; *McPherson* v. *Blacker*, 146 U. S. 1; *United States* v. *Sprague*, 282 U. S. 716; *Hawke* v. *Smith*, 253 U. S. 221; *Story* v. *Craig*, 231 N. Y. 33; *People ex rel. Snyder* v. *Hylan*, 212 N. Y. 236; *Matter of Doyle*, 257 N. Y. 244; *Pollack* v. *Bridgeport Steamboat Co.*, 114 U. S. 411; *Matter of McNiel*, 80 U. S. 236; *People ex rel. Einsfeld* v. *Murray*, 149 N. Y. 367.) Chapter 5 of the act of Congress of August 11, 1911, was limited to the apportionment therein made and expired with the enactment of the act of June 18, 1929. (*People ex rel. Smiley* v. *Holm*, 238 N. W. Rep. 494.)

*John J. Bennett, Jr., Attorney-General* (*Henry Epstein* of counsel), for Edward J. Flynn, respondent. One hundred and forty years of continued and uninterrupted

legislative experience of all the States in their districting for the election of Representatives of Congress furnishes a practical construction of article I, section 4, of the Federal Constitution opposed to the validity of the concurrent resolution of the Senate and the Assembly of the State of New York. (*Story* v. *Craig*, 231 N. Y. 33; *Matter of La Rocca* v. *Flynn*, 257 N. Y. 5; *Gardner* v. *Ginther*, 232 App. Div. 296; *People ex rel. Argus Co.* v. *Palmer*, 12 Misc. Rep. 392; 146 N. Y. 406; *People ex rel. Burritt* v. *Commissioners*, 11 N. E. Rep. 180; *Mullan* v. *California*, 114 Cal. 578; *May* v. *Rice*, 91 Ind. 546; *State* v. *Kinney*, 56 Ohio St. 721; *State ex rel. Peyton* v. *Cunningham*, 39 Mont. 197.) The constitutional use of the term " Legislature " in connection with the division of the State into districts for the purposes of election or otherwise has invariably had reference to the law-making body and not merely the elected representative bodies, such as the Senate and the Assembly. (*State ex rel. Barrett* v. *Hitchcock*, 241 Mo. 433; *Matter of Doyle*, 257 N. Y. 244; *Davis* v. *Hildebrandt*, 241 U. S. 565; *Hawke* v. *Smith*, 253 U. S. 221; *McPherson* v. *Blacker*, 146 U. S. 1; *Clairborne Co.* v. *Brooks*, 111 U. S. 400; *Detroit* v. *Osborne*, 135 U. S. 492.) The Congress of the United States has by law acted in a manner foreclosing the redistricting of New York State other than by statute. (*Davis* v. *Hildebrandt*, 241 U. S. 565; *Woods* v. *Supervisors*, 136 N. Y. 403; *Davis* v. *Supreme Lodge*, 165 N. Y. 159; *People* v. *Dwyer*, 215 N. Y. 46; *Matter of Tiffany*, 179 N. Y. 455; *Frost* v. *Wenie*, 157 U. S. 46; *United States* v. *Greathouse*, 166 U. S. 601.) Chapter 890 of the Laws of 1911 of the State of New York is still effective and has not been superseded or repealed by the concurrent resolution of the Senate and Assembly. (*Rumsey* v. *People*, 19 N. Y. 41.)

*John Godfrey Saxe, Robert F. Wagner* and *John J. O'Connor* for James A. Farley, respondent. The Senate

and Assembly was without power, by concurrent resolution, to repeal chapter 890 of the Laws of 1911, as amended, or the Election Law. (*People ex rel. Fitzgerald* v. *Voorhis*, 222 N. Y. 494; *Rumsey* v. *People*, 19 N. Y. 41.) The act of Congress of 1929 did not repeal sections 3 and 4 of the act of Congress of 1911, nor the United States Code. (*Coyle* v. *Oklahoma*, 221 U. S. 559; *People* v. *Worden*, 187 N. Y. 322; *Brown* v. *City*, 241 N. Y. 96; *United States* v. *Greathouse*, 166 U. S. 601; *United States* v. *Lee Yen Tai*, 185 U. S. 213; *Washington* v. *Miller*, 235 U. S. 422; *Graham* v. *Goodcell*, 282 U. S. 409; *Woods* v. *Supervisors*, 136 N. Y. 403; *Davis* v. *Lodge*, 165 N. Y. 159; *Matter of Tiffany*, 179 N. Y. 455; *People* v. *Dwyer*, 215 N. Y. 46; *United States* v. *Gear*, 44 U. S. 120; *The Reform*, 70 U. S. 617.)

CRANE, J. Following the census of 1910, Congress enacted the Thirteenth Apportionment Act, in August of 1911 (Vol. 37, U. S. Statutes at Large, chap. 5, p. 13). It reads in part as follows:

" That after the third day of March, nineteen hundred and thirteen, the House of Representatives shall be composed of four hundred and thirty-three Members, to be apportioned among the several States as follows: * * * New York, forty-three.

" Sec. 3. That in each State entitled under this apportionment to more than one Representative, the Representatives to the Sixty-third and each subsequent Congress, shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. The said districts shall be equal to the number of Representatives to which such State may be entitled in Congress, no district electing more than one Representative.

" Sec. 4. That in case of an increase in the number of representatives in any State under this apportionment, such additional Representative or Representatives shall

be elected by the State at large and the other Representatives by the districts now prescribed by law until such State shall be redistricted in the manner provided by the laws thereof and in accordance with the rules enumerated in section three of this Act; and if there be no change in the number of Representatives from a State, the Representatives thereof shall be elected from the districts now prescribed by law until such State shall be re-districted as herein prescribed."

Thereafter, and in accordance with this act of Congress, New York State passed an act known as chapter 890 of the Laws of 1911, which became a law on October 18, 1911, with the approval of the Governor. It read: " For the election of representatives in congress of the United States, this state shall be and is hereby divided into forty-three districts, namely,— " The districts were then described, and it wound up by stating that all acts inconsistent with this law were repealed.

Thus the matter stood. Representatives were elected in this State from the congressional districts described in this State law of 1911, up to and until the present time. Another census was taken, pursuant to an act of Congress, passed June 18, 1929. This act not only provided for the taking of the census, but also provided for the increase or decrease in State representation according to the results of the census. The total number of Representatives was not to be increased. (46 U. S. Stat. at Large, chap. 28, June 18, 1929.) That part of the act providing for the apportionment of Representatives is also to be found in Mason's Code (Vol. 5, No. 3, October, 1929, p. 20). Section 22(a) reads as follows:

" On the first day, or within one week thereafter, of the second regular session of the Seventy-first Congress and of each fifth Congress thereafter, the President shall transmit to the Congress a statement showing the whole number of persons in each State, excluding Indians not taxed, as ascertained under the fifteenth and each sub-

sequent decenial census of the population, and the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives made in each of the following manners: [the rule is then stated]  *  *  *

" (b) If the Congress to which the statement required by subdivision (a) of this section is transmitted, fails to enact a law apportioning Representatives among the several States, then each State shall be entitled, in the second succeeding Congress and in each Congress thereafter until the taking effect of a reapportionment under this Act or subsequent statute, to the number of Representatives shown in the statement based upon the method used in the last preceding apportionment. It shall be the duty of the Clerk of the last House of Representatives forthwith to send to the executive of each State a certificate of the number of Representatives to which such State is entitled under this section.  *  *  * "

This much of the act of June 18, 1929, I have quoted, in order to show that it provided for the apportionment of four hundred and thirty-three Representatives among the various States according to population as indicated by the census, but in no way indicated how the number of Representatives allotted to each State should be chosen. The previous apportionment act of August 8, 1911, in sections 3 and 4, above quoted, made such a direction, but it is lacking in this later act of June 18, 1929. Upon the certificate of the President to Congress, followed by the certificate of the Clerk of the House, all in accordance with the provisions of the census and apportionment act of June 18, 1929, New York became entitled to forty-five Representatives instead of the forty-three apportioned to it under the act of 1911. This was an increase of two. How are the two to be elected?

The New York Legislature determined that it could be done by a joint resolution, and on April 10, 1931, divided the State into forty-five congressional districts in this

manner. The concurrent resolution not being a law was, of course, not submitted to the Governor for his approval, pursuant to the Constitution of this State. This method of electing Congressmen is here challenged on two grounds: *First*, because the Legislature must redistrict the State by a duly enacted law, and not by resolution, and *second*, if this be not so, the act of Congress, August 8, 1911, is still in force and effect.

The Constitution of the United States, article I, section 4, provides: " The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

By the Constitution of the State of New York, article III, section 1, the legislative power of the State is vested in the Senate and Assembly. The law-making power, however, includes control or supervision by the Governor in so far as it is provided by article IV of the Constitution, section 9, that:

" Every bill which shall have passed the Senate and Assembly shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it shall have originated, which shall enter the objections at large on the journal, and proceed to reconsider it. If after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill, it shall be sent together with the objections, to the other house, by which it shall likewise be reconsidered; and if approved by two-thirds of the members elected to that house, it shall become a law notwithstanding the objections of the Governor."

When this government began to function under the Constitution adopted in 1787–1789, the then existing States apparently understood section 4, article I, of the Federal Constitution to refer to the law-making power of

the Legislature or to such bodies as the individual States had created for the enactment of laws. The uninterrupted practice in all of the States has been to create congressional districts by laws enacted in accordance with the Constitution of the respective States, whatever that may be. While the plain and direct provisions of a constitution cannot be modified or amended by practice, custom or violation, no matter how long continued, such uniformity by all the States in the method of electing Congressmen indicates quite clearly the meaning which was given to section 4 of article I, especially in the early days when the people were so sensitive to intrusion and control by individual executives. A uniform course of action involving the right to the exercise of an important power by the State government without question is no unsatisfactory evidence that the power is rightfully exercised. (*Briscoe* v. *Bank of Kentucky*, 36 U. S. 257; *McPherson* v. *Blacker*, 146 U. S. 1, pp. 36, 37; *United States* v. *Sprague*, 282 U. S. 716; *Matter of Wendell* v. *Lavin*, 246 N. Y. 115; *People* v. *Tremaine*, 252 N. Y. 27.)

The wording of section 4, article I, very likely suggested that the action by the State Legislature under it should be in the form of a law. It was to be more than an assent by the people of the State to some Federal proposition and more than a choice by them of a Federal representative. The legislative act was to be a direction to the people of the State demanding certain things to be done, fixing a time, a place, and a manner which had to be followed. From the Legislature was to come a mandate, the disobedience of which would result in penalties or legal consequences. Naturally, this would be effected in the same way as all other like mandates. The action of the Legislature would, therefore, be in the form of a law. Section 4 says that the times, places and manner shall be "prescribed" by the Legislature. "Prescribed" means to lay down authoritatively a rule of action. From time immemorial this has been done

by a law according to the forms existing at the time. That which must be obeyed and followed by citizens subject to sanctions or legal consequences is a law. Such a direction must take the form of law. Likewise, in section 4, we find that Congress may exercise the power given to the State Legislature, and when it makes its regulations, it shall do so " by law." The matter being dealt with in section 4 is the time, place and manner of holding elections for Representatives. Whether these details be fixed by the Legislature of the State or by Congress, they are to be fixed by law. If Congress must do it by law, it is reasonable to suppose that the State Legislature was intended to do it in the same way. This at least has been the interpretation given to this section for over one hundred and forty years, and it is too late now to overturn it.

There is a distinction to be drawn between the functions of a Legislature, such, for instance, as choosing Senators, making application to the Federal government for protection against invasion, ratifying a constitutional amendment, consenting to a purchase of State lands — there is, I say, a difference between these functions of the Legislature and the prescribing or enacting of a rule or direction, which must be followed and obeyed by the people of the State, called the law-making power; such, for instance, as dividing the State into congressional districts and directing the people where, when and how to vote. We find such a distinction referred to in *McPherson* v. *Blacker* (146 U. S. 1); *State ex rel. Davis* v. *Hildebrant* (241 U. S. 565); *Hawke* v. *Smith* (253 U. S. 221); *United States* v. *Sprague* (282 U. S. 716), although these cases did not pass upon the point here in question. (See, also, *Matter of Doyle*, 257 N. Y. 244.) We conclude, therefore, that the resolution of April 10, 1931, was ineffective, and that its attempted redistricting of the State is null and void.

Even if this were not so, we would be inclined to hold

that the act of Congress, August 8, 1911, was still in force and effect as a regulation to be followed in providing for the election of an additional number of Representatives. Section 3 of that act certainly is a general provision which practically can apply to any increase or decrease in the number of Representatives. Section 4, while in terms limited to the apportionment under the act of 1911, also provides and enacts a general rule which may be adopted to subsequent changes in the number of Representatives, the rule being that additional Representatives are to be elected at large and the others according to existing laws. This is simple, direct and universal. The act of June 18, 1929, did not touch these matters, made no reference whatever to the provisions enacted in sections 3 and 4 of the Laws of 1911. The number of Representatives in any given State was automatically readjusted upon the certificate of the President after each census. This was the only thing accomplished by the act of June 18, 1929. We do not think that Congress intended to repeal the act of 1911 or thought that it would terminate upon the passage of the subsequent act. The two should be read together, if possible. One provided for the method of election and the other merely for the number of Representatives. The two can be read together as a fair and reasonable regulation by Congress for the election of its Representatives, and this is the view we shall take of it.

Even if we were to take a different view, however, our conclusion would be that by the act of 1911 and the similar acts that preceded it, there had been a practical recognition by Congress of the just and reasonable rule to be followed in the absence of a statute, and that this rule should be adhered to even if the statute does not govern *ex proprio vigore*.

With this expression of our opinion, we hold that the resolution of April 10, 1931, is without effect; that forty-three of the forty-five Congressmen are to be elected

according to the districts created by chapter 890 of the Laws of 1911 of the State of New York, as amended, and the additional two will be elected at large by the entire State. This, of course, is in the absence of a law passed by the present Legislature now in session, redistricting the State into forty-five congressional districts.

The order below should be affirmed, without costs.

CARDOZO, Ch. J., POUND, LEHMAN, O'BRIEN and HUBBS, JJ., concur; KELLOGG, J., not sitting.

Order affirmed.