SMILEY *v.* HOLM, SECRETARY OF STATE.

No. 617.   Argued March 16, 17, 1932.—Decided April 11, 1932.

356

*Messrs. George T. Simpson* and *Alfred W. Bowen,* with whom *Messrs. John A. Weeks* and *W. Yale Smiley* were on the brief, for petitioner.

*Messrs. Henry N. Benson,* Attorney General of Minnesota, and *William H. Gurnee,* Assistant Attorney General, for respondent.

360

MR. CHIEF JUSTICE HUGHES delivered the opinion of the Court.

Under the re-apportionment following the fifteenth decennial census, as provided by the Act of Congress of June 18, 1929 (c. 28, 46 Stat. 21, 26), Minnesota is entitled to nine representatives in Congress, being one less than the number previously allotted. In April, 1931, the bill known as House File No. 1456, dividing the State into nine congressional districts and specifying the counties of which they should be composed, was passed by the House of Representatives and the Senate of the State and was transmitted to the Governor, who returned it without his approval. Thereupon, without further action upon the measure by the House of Representatives and the Senate, and in compliance with a resolution of the House of Representatives, House File No. 1456 was deposited with the Secretary of State of Minnesota. This suit was brought by the petitioner as a ' citizen, elector and taxpayer ' of the State to obtain a judgment declaring invalid all filings for nomination for the office of representative in Congress, which should designate a subdivision of the State as a congressional district, and to enjoin the Secretary of State from giving notice of the holding of elections for that office in such subdivi-

sions. The petition alleged that House File No. 1456 was a nullity in that, after the Governor's veto, it was not repassed by the legislature as required by law, and also in that the proposed congressional districts were not 'compact' and did not 'contain an equal number of inhabitants as nearly as practicable' in accordance with the Act of Congress of August 8, 1911.[1]

The respondent, Secretary of State, demurred to the petition upon the ground that it did not state facts sufficient to constitute a cause of action. He maintained the validity of House File No. 1456 by virtue of the authority conferred upon the legislature by Article I, section 4, of the Federal Constitution, and he insisted that the Act of

---

[1] The Act of August 8, 1911, c. 5, 37 Stat. 13, provided for the apportionment of representatives in Congress among the several States under the thirteenth census. After fixing the total number of representatives and their apportionment, in sections 1 and 2, the Act provided as follows:

"Sec. 3. That in each State entitled under this apportionment to more than one Representative, the Representatives to the Sixty-third and each subsequent Congress shall be elected by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants. The said districts shall be equal to the number of Representatives to which such State may be entitled in Congress, no district electing more than one Representative.

"Sec. 4. That in case of an increase in the number of Representatives in any State under this apportionment such additional Representative or Representatives shall be elected by the State at large and the other Representatives by the districts now prescribed by law until such State shall be redistricted in the manner provided by the laws thereof and in accordance with the rules enumerated in section three of this Act; and if there be no change in the number of Representatives from a State, the Representatives thereof shall be elected from the districts now prescribed by law until such State shall be redistricted as herein prescribed.

"Sec. 5. That candidates for Representative or Representatives to be elected at large in any State shall be nominated in the same manner as candidates for governor, unless otherwise provided by the laws of such State."

Congress of August 8, 1911, was no longer in force and that the asserted inequalities in redistricting presented a political and not a judicial question. The trial court sustained the demurrer and its order was affirmed by the Supreme Court of the State. 184 Minn. 228; 238 N. W. 494. The action was then dismissed upon the merits and the Supreme Court affirmed the judgment upon its previous opinion. This Court granted a writ of certiorari.

Article I, section 4, of the Constitution of the United States provides:

" The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."

Under the constitution of Minnesota, the ' legislature ' consists ' of the Senate and House of Representatives.' Const. Minn., Art. 4, sec. 1. Before any bill passed by the Senate and House of Representatives " becomes a law," it must " be presented to the Governor of the state," and if he returns it, within the time stated, without his approval, the bill may become a law provided it is reconsidered and thereupon passed by each house by a two-thirds vote. *Id.,* Art. 4, sec. 11. The state constitution also provides that after each Federal census " the legislature shall have the power to prescribe the bounds of congressional . . . districts." *Id.,* Art. 4, sec. 23. We do not understand that the Supreme Court of the State has held that, under these provisions, a measure redistricting the State for congressional elections could be put in force by the legislature without participation by the Governor, as required in the case of legislative bills, if such action were regarded as a performance of the function of the legislature as a lawmaking body. No decision to that effect has been cited. It appears that ' on seven occasions ' prior to the measure now under consideration, the legislature of Min-

nesota had ' made state and federal reapportionments in the form of a bill for an act which was approved by the Governor.'[2] While, in the instant case, the Supreme Court regarded that procedure as insufficient to support the petitioner's contention as to practical construction, that question was dismissed from consideration because of the controlling effect which the court ascribed to the Federal provision. 184 Minn. 241; 238 N. W. 500. The court expressed the opinion that " the various provisions of our state constitution cited in the briefs are of little importance in relation to the matter now in controversy "; that " the power of the state Legislature to prescribe congressional districts rests exclusively and solely in the language of article I, section 4, of the United States Constitution." *Id.*, 235; 497. Construing that provision, the court reached the conclusion that the legislature in redistricting the State was not acting strictly in the exercise of the lawmaking power but merely as an agency, discharging a particular duty in the manner which the Federal Constitution required. Upon this point the court said (*id.*, 238; 499):

" The Legislature in districting the state is not strictly in the discharge of legislative duties as a law-making body, acting in its sovereign capacity, but is acting as representative of the people of the state under the power granted by said Article I, section 4. It merely gives expression as to district lines in aid of the election of certain federal officials; prescribing one of the essential details serving primarily the federal government and secondly the people of the state. The Legislature is designated as a mere agency to discharge the particular duty. The Governor's veto has no relation to such matters; that power pertains under the state Constitution exclu-

[2] See Laws of Minnesota, 1858, c. 83; 1872, c. 21; 1881, c. 128; 1891, c. 3; 1901, c. 92; 1913, c. 513; 1929, c. 64.

sively to state affairs. The word 'legislature' has reference to the well-recognized branch of the state government—created by the state as one of its three branches for a specific purpose—and when the framers of the Federal Constitution employed this term, we believe they made use of it in the ordinary sense with reference to the official body invested with the functions of making laws, the legislative body of the state; and that they did not intend to include the state's chief executive as a part thereof. We would not be justified in construing the term as being used in its enlarged sense as meaning the state or as meaning the law-making power of the state."

The question then is whether the provision of the Federal Constitution, thus regarded as determinative, invests the legislature with a particular authority and imposes upon it a corresponding duty, the definition of which imports a function different from that of lawgiver and thus renders inapplicable the conditions which attach to the making of state laws. Much that is urged in argument with regard to the meaning of the term 'Legislature' is beside the point. As this Court said in *Hawke* v. *Smith, No. 1,* 253 U. S. 221, 227, the term was not one "of uncertain meaning when incorporated into the Constitution. What it meant when adopted it still means for the purpose of interpretation. A Legislature was then the representative body which made the laws of the people." The question here is not with respect to the 'body' as thus described but as to the function to be performed. The use in the Federal Constitution of the same term in different relations does not always imply the performance of the same function. The legislature may act as an electoral body, as in the choice of United States Senators under Article I, section 3, prior to the adoption of the Seventeenth Amendment. It may act as a ratifying body, as in the case of proposed amendments to the Constitution under Article V. *Hawke* v. *Smith, No.*

*1, supra; Id.,* No. 2, 253 U. S. 231; *Leser* v. *Garnett,* 258 U. S. 130, 137. It may act as a consenting body, as in relation to the acquisition of lands by the United States under Article I, section 8, paragraph 17. Wherever the term 'legislature' is used in the Constitution it is necessary to consider the nature of the particular action in view. The primary question now before the Court is whether the function contemplated by Article I, section 4, is that of making laws.

Consideration of the subject matter and of the terms of the provision requires affirmative answer. The subject matter is the " times, places and manner of holding elections for Senators and Representatives." It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved. And these requirements would be nugatory if they did not have appropriate sanctions in the definition of offenses and punishments. All this is comprised in the subject of " times, places and manner of holding elections " and involves lawmaking in its essential features and most important aspect.

This view is confirmed by the second clause of Article I, section 4, which provides that " the Congress may at any time by law make or alter such regulations," with the single exception stated. The phrase " such regulations " plainly refers to regulations of the same general character that the legislature of the State is authorized to prescribe with respect to congressional elections. . In exercising this power, the Congress may supplement these state regula-

tions or may substitute its own. It may impose additional penalties for the violation of the state laws or provide independent sanctions. It 'has a general supervisory power over the whole subject.' *Ex parte Siebold,* 100 U. S. 371, 387; *Ex parte Yarbrough,* 110 U. S. 651, 661; *Ex parte Clarke,* 100 U. S. 399; *United States* v. *Mosley,* 238 U. S. 383, 386; *Newberry* v. *United States,* 256 U. S. 232, 255. But this broad authority is conferred by the constitutional provision now under consideration and is exercised by the Congress in making " such regulations," that is, regulations of the sort which, if there be no overruling action by the Congress, may be provided by the legislature of the State upon the same subject.

The term defining the method of action, equally with the nature of the subject matter, aptly points to the making of laws. The state legislature is authorized to " *prescribe* " the times, places and manner of holding elections. Respondent urges that the fact that the words " *by law* " are found in the clause relating to the action of the Congress, and not in the clause giving authority to the state legislature, supports the contention that the latter was not to act in the exercise of the lawmaking power. We think that the inference is strongly to the contrary. It is the nature of the function that makes the phrase " by law " apposite. That is the same whether it is performed by state or national legislature, and the use of the phrase places the intent of the whole provision in a strong light. Prescribing regulations to govern the conduct of the citizen, under the first clause, and making and altering such rules by law, under the second clause, involve action of the same inherent character.

As the authority is conferred for the purpose of making laws for the State, it follows, in the absence of an indication of a contrary intent, that the exercise of the authority must be in accordance with the method which the State has prescribed for legislative enactments. We find

no suggestion in the Federal constitutional provision of an attempt to endow the legislature of the State with power to enact laws in any manner other than that in which the constitution of the State has provided that laws shall be enacted. Whether the Governor of the State, through the veto power, shall have a part in the making of state laws is a matter of state polity. Article I, section 4, of the Federal Constitution, neither requires nor excludes such participation. And provision for it, as a check in the legislative process, cannot be regarded as repugnant to the grant of legislative authority. At the time of the adoption of the Federal Constitution it appears that only two States had provided for a veto upon the passage of legislative bills; Massachusetts, through the Governor, and New York, through a Council of Revision.[3] But the restriction which existed in the case of these States was well known. That the state legislature might be subject to such a limitation, either then or thereafter imposed as the several States might think wise, was no more incongruous with the grant of legislative authority to regulate congressional elections than the fact that the Congress in making its regulations under the same provision would be subject to the veto power of the President as provided in Article I, section 7.

---

[3] The constitution of Massachusetts of 1780 provided for the Governor's veto of " bills " or " resolves." Part Second, Chap. I, sec. I, Art. II; 3 Thorpe, American Charters, Constitutions and Organic Laws, 1893, 1894. The Council of Revision in New York, which had the veto power under the first constitution of 1777 (Art. III), was composed of the Governor, the Chancellor, and the Judges of the Supreme Court, " or any two of them, together with the Governor." The veto power was given to the Governor alone by the constitution of 1821. Art. I, sec. 12, 3 Thorpe, op. cit., 2628, 2641, 2642. In South Carolina, the veto power had been given by the constitution of 1776 to the " president " (Art. VII), but under the constitution of 1778 the Governor had no veto power; see Art. XVI, 6 Thorpe, op. cit., 3244, 3252.

The latter consequence was not expressed but there is no question that it was necessarily implied, as the Congress was to act by law; and there is no intimation, either in the debates in the Federal Convention or in contemporaneous exposition, of a purpose to exclude a similar restriction imposed by state constitutions upon state legislatures when exercising the lawmaking power.

The practical construction of Article I, section 4, is impressive. General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political rights and hence subject to constant and careful scrutiny. Certainly, the terms of the constitutional provision furnish no such clear and definite support for a contrary construction as to justify disregard of the established practice in the States. *McPherson v. Blacker*, 146 U. S. 1, 36; *Missouri Pacific Ry. Co. v. Kansas*, 248 U. S. 276, 284; *Myers v. United States*, 272 U. S. 52, 119, 136; *The Pocket Veto Case*, 279 U. S. 655, 688–690. That practice is eloquent of the conviction of the people of the States, and of their representatives in state legisle · ires and executive office, that in providing for congressional elections, and for the districts in which they were to be held, these legislatures were exercising the lawmaking power and thus were subject, where the state constitution so provided, to the veto of the Governor as a part of the legislative process. The early action in Massachusetts under this authority was by 'resolves' and these, under the constitution of 1780, were required to be submitted to the Governor and it appears that they were so submitted and approved by him.[4] In New York,

---

[4] Const. Mass. 1780; 3 Thorpe, *op cit.*, 1893, 1894; Mass. Resolves, Oct.–Nov., 1788, c. XLIX, p. 52; May–June, 1792, c. LXIX, p. 23.

370

from the outset, provision for congressional districts was made by statute [5] and this method was followed until 1931. The argument based on the disposition, during the early period, to curtail executive authority in the States, and on the long time which elapsed in a number of States before the veto power was granted to the Governor, is of slight weight in the light of the fact that this power was given in four States shortly after the adoption of the Federal Constitution,[6] that the use of this check has gradually been extended, and that the uniform practice (prior to the questions raised in relation to the present reapportionment) has been to provide for congressional districts by the enactment of statutes with the participation of the Governor wherever the state constitution provided for such participation as part of the process of making laws. See *Moran* v. *Bowley* (Ill.) 179 N. E. 526, 527; *Koenig* v. *Flynn,* 258 N. Y. 292, 300; 179 N. E. 705; *Carroll* v. *Becker* (Mo.), 45 S. W. (2d) 533; *State ex rel. Schrader* v. *Polley,* 26 S. D. 5, 7; 127 N. W. 848. The Attorney General of Minnesota, in his argument in the instant case, states: "It is conceded that until 1931 whenever the State of Minnesota was divided into districts for the purpose of congressional elections such action was taken by the legislature in the form of a bill and presented to and approved by the governor."

[5] New York, Laws of 1789, Chap. 11; 1797, Chap. 62; 1802, Chap. 72. See *Koenig* v. *Flynn,* 258 N. Y. 292; 179 N. E. 705.

[6] Georgia, Const. 1789, Art. II, sec. 10, 2 Thorpe, *op. cit.,* 788; Pennsylvania, Const. 1790, Art. I, sec. 22, 5 Thorpe, *op. cit.,* 3094; New Hampshire, Const. 1792, Part Second, sec. XLIV, 4 Thorpe, *op. cit.,* 2482; Kentucky, Const. 1792, Art. I, sec. 28, 3 Thorpe, *op. cit.,* 1267. In Vermont, the constitution of 1793 (Chap. II, sec. 16) gave the Governor and Council a power of suspension similar to that for which provision had been made in the constitution of 1786 (Chap II, sec. XVI) before the admission of Vermont to the Union. See, also, constitution of 1777 (Chap. II, sec. XIV), 6 Thorpe, *op. cit.,* 3744, 3757, 3767.

That the constitutional provision contemplates the exercise of the lawmaking power was definitely recognized by the Congress in the Act of August 8, 1911,[7] which expressly provided in section 4 for the election of representatives in Congress, as stated, " by the districts now prescribed by law until such state shall be redistricted in the manner provided by the laws thereof and in accordance with the rules enumerated in section three of this Act." The significance of the clause " in the manner provided by the laws thereof " is manifest from its occasion and purpose. It was to recognize the propriety of the referendum in establishing congressional districts where the State had made it a part of the legislative process. " It is clear," said this Court in *Davis* v. *Hildebrant,* 241 U. S. 565, 568, " that Congress in 1911 in enacting the controlling law concerning the duties of the States through their legislative authority, to deal with the subject of the creation of congressional districts expressly modified the phraseology of the previous acts relating to that subject by inserting a clause plainly intended to provide that where by the state constitution and laws the referendum was treated as part of the legislative power, the power as thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts by law."

The case of *Davis* v. *Hildebrant, supra,* arose under the amendment of 1912 to the constitution of Ohio reserving the right " by way of referendum to approve or disapprove by popular vote any law enacted by the General Assembly." *Id.,* p. 566. The act passed by the General Assembly of Ohio in 1915, redistricting the State for the purpose of congressional elections, was disapproved under the referendum provision and the validity of that action was challenged under Article I, section 4, of the Federal

[7] See Note 1.

Constitution.   The Supreme Court of the State, denying a mandamus to enforce the disapproved act, "held that the provision as to referendum was a part of the legislative power of the State, made so by the. Constitution, and that nothing in the Act of Congress of 1911 or in the constitutional provision operated to the contrary and that therefore the disapproved law had no existence." *Id.*, p. 567.   This Court affirmed the judgment of the state court.   It is manifest that the Congress had no power to alter Article I, section 4, and that the Act of 1911, in its reference to state laws, could but operate as a legislative recognition of the nature of the authority deemed to have been conferred by the constitutional provision.   And it was because of the authority of the State to determine what should constitute its legislative process that the validity of the requirement of the state constitution of Ohio, in its application to congressional elections, was sustained.   This was explicitly stated by this Court as the ground of the distinction which was made in *Hawke* v. *Smith, No. 1, supra,* where, referring to the *Davis* case the Court said: "As shown in the opinion in that case, Congress had itself recognized the referendum as part of the legislative authority of the State for the purpose stated.   It was held, affirming the judgment of the Supreme Court of Ohio, that the referendum provision of the state constitution when applied to a law redistricting the State with a view to representation in Congress was not unconstitutional.   Article I, section 4, plainly gives authority to the State to legislate within the limitations therein named.   Such legislative action is entirely different from the requirement of the Constitution as to the expression of assent or dissent to a proposed amendment to the Constitution.   In such expression no legislative action is authorized or required."

It clearly follows that there is nothing in Article I, section 4, which precludes a State from providing that

legislative action in districting the State for congressional elections shall be subject to the veto power of the Governor as in other cases of the exercise of the lawmaking power. Accordingly, in this instance, the validity of House File No. 1456 cannot be sustained by virtue of any authority conferred by the Federal Constitution upon the legislature of Minnesota to create congressional districts independently of the participation of the Governor as required by the state constitution with respect to the enactment of laws.

The further question has been presented whether the Act of Congress of August 8, 1911, is still in force. The state court held that it was not, that it had been wholly replaced by the Act of June 18, 1929. Sections 1 and 2 of the former Act, making specific provision for the apportionment under the thirteenth census, are of course superseded; the present question relates to the other sections. These have not been expressly repealed. The Act of 1929 repeals "all other laws and parts of laws" that are inconsistent with its provisions (§ 21). The petitioner urges that this Act contains nothing inconsistent with sections 3, 4 and 5 [8] of the Act of 1911, and the only question is whether these sections by their very terms have ceased to be effective. It is pointed out that the provisions of the Act of 1911 were carried into the United States Code. U. S. C., Tit. 2, §§ 2-5. Inclusion in the Code does not operate as a re-enactment; it establishes "prima facie the laws of the United States, general and permanent in their nature, in force on the 7th day of December, 1925." Act of June 30, 1926, c. 712, 44 Stat. 1. While sections 3 and 4 of the Act of 1911 expressly referred to 'this apportionment' (the one made by that Act), the argument is pressed that they contain provisions setting forth a general policy which was intended to apply

[8] See Note 1.

to the future creation of congressional districts, and the election of representatives, until Congress should provide otherwise.

There are three classes of States with respect to the number of representatives under the present apportionment pursuant to the Act of 1929, (1) where the number remains the same, (2) where it is increased, and (3) where it is decreased. In States where the number of representatives remains the same, and the districts are unchanged, no question is presented; there is nothing inconsistent with any of the requirements of the Congress in proceeding with the election of representatives in such States in the same manner as heretofore. Section 4 of the Act of 1911 provided that in case of an increase in the number of representatives in any State, " such additional representative or representatives shall be elected by the State at large and the other representatives by the districts now prescribed by law " until such State shall be redistricted. The Constitution itself provides in Article I, section 2, that " The House of Representatives shall be composed of Members chosen every second Year by the People of the several States," and we are of the opinion that under this provision, in the absence of the creation of new districts, additional representatives allotted to a State under the present reapportionment would appropriately be elected by the State at large. Such a course, with the election of the other representatives in the existing districts until a redistricting act was passed, would present no inconsistency with any policy declared in the Act of 1911.

Where, as in the case of Minnesota, the number of representatives has been decreased, there is a different situation as existing districts are not at all adapted to the new apportionment. It follows that in such a case, unless and until new districts are created, all representatives allotted to the State must be elected by the State at

large. That would be required, in the absence of a redis-tricting act, in order to afford the representation to which the State is constitutionally entitled, and the general provisions of the Act of 1911 cannot be regarded as intended to have a different import.

This conclusion disposes of all the questions properly before the Court. Questions in relation to the application of the standards defined in section 3 of the Act of 1911 to a redistricting statute, if such a statute should hereafter be enacted, are wholly abstract. The judgment is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.