# Commonwealth ex rel. Dummit, Attorney General, v. O'Connell, Secretary of State, et al.

June 23, 1944.

Eldon S. Dummit, Attorney General, Harry H. Wilson and M. J. Sternberg, Assistant Attorneys General, for appellant.

A. E. Funk and Sarah Layman for appellee Charles K. O'Connell, Secretary of State.

Samuel M. Rosenstein for appellee and intervening petitioner, American Legion of Kentucky.

OPINION OF THE COURT BY JUDGE TILFORD—Affirming.

In this solemn moment in the Country's history it has devolved upon this Court to say whether the youth of our native State, now absent in the defense of the nation, shall be permitted to enjoy the right attempted to be conferred upon them by the 1944 General Assembly to vote in presidential and congressional elections. As to their moral right, there can be no question. Their legal right, denied by the State Constitution, is dependent upon whether the Legislature, in endeavoring to confer it, was so empowered by the people of the whole Union, speaking through the Federal Constitution. The question turns upon the meaning and intent of the following provisions of Section 1 of Article II, and Section 4 of Article I of the Federal Constitution:

Section 1, Article II. "The executive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and together with the Vice President, chosen for the same Term, be elected, as follows

"Each State shall appoint in such Manner as the

Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress; but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector."

Section 4, Article I. "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."

The Attorney General of the State contends in substance that the framers of the Federal Constitution intended by the language quoted to vest the states, and not the legislature thereof, with the powers enumerated, from which it would follow that in speaking for the State on the designated subjects, the Legislature may not prescribe a method of choosing Presidential Electors or members of Congress forbidden by the State Constitution. Section 147 of the Kentucky Constitution provides, among other things:

"* * * all elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls, and then and there deposited."

Since the Act of 1944 Kentucky Legislature attacked in this action instituted by the Attorney General for a declaration of rights, permits "absentee voting" by constitutionally qualified citizens of the State absent from their voting precincts, during a state of war, the Attorney General insists that the judgment of the Chancellor upholding the validity of the Act is erroneous and should be reversed.

It would seem that a question of such importance as the one we are called upon to decide would have been heretofore adjudicated by the final interpreter of the Federal Constitution, the Supreme Court. It is argued by the Attorney General that that Tribunal has determined the question by its opinions in the cases of McPherson et al. v. Blacker, Secretary of State, 146 U. S. 1, 13 S. Ct. 3, 36 L. Ed. 869; Smiley v. Holm, Secretary of State of Minnesota, 285 U. S. 355, 52 S. Ct. 397, 76 L. Ed. 795; United States v. Classic et al., 313 U. S.

299, 61 S. Ct. 1031, 85 L. Ed. 1368; but we are unable to agree. The first of the three cases cited sustained, as did the Supreme Court of Michigan, an Act of that State providing for the election of Presidential Electors by congressional districts instead of by the people of the state at large. The ground on which the constitutionality of the Act was attacked was not that it violated the provisions of the State Constitution, but was in contravention of Section 1 of Article II of the Federal Constitution; and in the course of an exhaustive opinion, Mr. Chief Justice Fuller said [146 U. S. 1, 13 S. Ct. 6, 36 L. Ed. 869]:

" 'A state, in the ordinary sense of the constitution,' said Chief Justice Chase, ([State of] Texas v. White, 7 Wall. 700, 731 [19 L. Ed. 227]) is a political community of free citizens, occupying a territory of defined boundaries, and organized under a government sanctioned and limited by a written constitution, and established by the consent of the governed.' The state does not act by its people in their collective capacity, but through such political agencies as are duly constituted and established. The legislative power is the supreme authority, except as limited by the constitution of the state, and the sovereignty of the people is exercised through their representatives in the legislature, unless by the fundamental law power is elsewhere reposed. The constitution of the United States frequently refers to the state as a political community, and also in terms to the people of the several states and the citizens of each state. What is forbidden or required to be done by a state is forbidden or required of the legislative power under state constitutions as they exist. The clause under consideration does not read that the people or the citizens shall appoint, but that 'each state shall;' and if the words, 'in such manner as the legislature thereof may direct,' had been omitted, it would seem that the legislative power of appointment could not have been successfully questioned in the absence of any provision in the state constitution in that regard. Hence the insertion of those words, while operating as a limitation upon the state in respect of any attempt to circumscribe the legislative power, cannot be held to operate as a limitation on that power itself."

But, later in the same opinion, it is said:

"The constitution does not provide that the appoint-

ment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object.

"The framers of the constitution employed words in their natural sense; and, where they are plain and clear, resort to collateral aids to interpretation is unnecessary, and cannot be indulged in to narrow or enlarge the text; but where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction is entitled to the greatest weight."

And still later, the Chief Justice, in narrating the history of the Article subsequent to its adoption, quotes Senator Morton's report of May 28, 1874, recommending an amendment dividing the states into electoral districts:.

" 'The appointment of these electors is thus placed absolutely and wholly with the legislatures of the several states. They may be chosen by the legislature, or the legislature may provide that they shall be elected by the people of the state at large, or in districts, as are members of congress, which was the case formerly in many states; and it is no doubt competent for the legislature to authorize the governor or the supreme court of the state, or any other agent of its will, to appoint these electors. This power is conferred upon the legislatures of the states by the constitution of the United States, and cannot be taken from them or modified by their state constitutions any more than can their power to elect senators of the United States. Whatever provisions may be made by statute, or by the state constitution, to choose electors by the people, there is no doubt of the right of the legislature to resume the power at any time, for it can neither be taken away nor abdicated.' Senate Rep. 1st Sess. 43d Cong. No. 395.

"From this review, in which we have been assisted by the laborious research of counsel, and which might have been greatly expanded, it is seen that from the formation of the government until now the practical construction of the clause has conceded plenary power to

the state legislatures in the matter of the appointment. of electors."

Smiley v. Holm, supra, reversed the decision of the Supreme Court of Minnesota holding valid an act of the Legislature redistricting the State for congressional representation. The Act was attacked because it had not received the governor's approval, a requisite to the validity of the Act under the provisions of the State Constitution. The Minnesota Court held that the Legislature, in redistricting the State, was not acting strictly in the exercise of the law making power, but merely as an agency discharging a particular duty in the manner required by the Federal Constitution. In holding that the Governor's approval was essential to the Act's validity, the Supreme Court said, speaking through Chief Justice Hughes [285 U. S. 355, 52 S. Ct. 399, 76 L. Ed. 795]:

"The primary question now before the Court is whether the function contemplated by article 1, sec. 4 is that of making laws.

"Consideration of the subject-matter and of the terms of the provision requires affirmative answer. * * * As the authority is conferred for the purpose of making laws * * *, it follows, in the absence of an indication of a contrary intent, that the exercise of the authority must be in accord with the method which the state has prescribed for legislative enactments. We find no suggestion in the federal constitutional provision of an attempt to endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted. Whether the Governor of a state, through the veto power, shall have a part in the making of State laws, is a matter of state polity. Article 1, sec. 4, of the Federal Constitution neither requires nor excludes such participation. * * *

"That practice is eloquent of the conviction of the people of the states, and of their representatives in state Legislatures and executive office, that in providing for congressional elections, and for the districts in which they were to be held, these Legislatures were exercising the lawmaking power and thus were subject, where the state Constitution so provided, to the veto of the Governor as a part of the legislative process. * * *"

United States v. Classic et al., supra, involved the applicability of provisions of the Federal Criminal Code to offenses committed in primary elections in which candidates for the office of Representative in Congress are selected; and in the course of the opinion reversing the judgment of the District Court sustaining the demurrer to the indictment, the Court, speaking through Mr. Chief Justice Stone, stated that the right secured by the Constitution to qualified voters to choose members of the House of Representatives "is thus to be exercised in conformity to the requirements of state law subject to the restrictions prescribed by sec. 2 and to the authority conferred on Congress by sec. 4 (Article I), to regulate the times, places, and manner of holding elections for representatives." [313 U. S. 299, 61 S. Ct. 1035, 85 L. Ed. 1368.] And again, in speaking of the authority conferred by Section 2 of Article I, the Chief Justice referred to it as authority conferred upon the "States."

We do not regard the case of United States v. Classic, supra, as having any bearing on the question before us. The case of McPherson et al. v. Blacker, supra, is relied upon by both parties as sustaining their respective contentions. While the opinion in the case of Smiley v. Holm, Secretary of State of Minnesota, holds that a legislature must function in the method prescribed by the State Constitution in directing the times, places, and manner of holding elections for senators and representatives in Congress, since in so doing it is exercising the function of lawmaking, it does not necessarily follow that when functioning in the manner prescribed by the State Constitution, the scope of its enactment on the indicated subjects is also limited by the provisions of the State Constitution. In short, we think that the holdings of the Supreme Court in the case last referred to, so far as they are applicable to the question before us, may properly be said to mean no more than that the legislative process must be completed in the manner prescribed by the State Constitution in order to result in a valid enactment, even though that enactment be one which the Legislature is authorized by the Federal Constitution to make.

The Attorney General also cites the decision of the Supreme Court of South Dakota in the case of State ex rel. Schrader v. Polley, 26 S. D. 5, 127 N. W. 848, as fully sustaining his contention. Of similar import to that of

the South Dakota case is the advisory Opinion of the Justices of the Maine Supreme Court in 118 Me. 552, 107 A. 705, 5 A. L. R. 1407; but both of these opinions involved referendum provisions of the State Constitution, and, as pointed out in State of Ohio ex rel. David Davis v. Charles Q. Hildebrant, etc., 241 U. S. 565, 36 S. Ct. 708, 60 L. Ed. 1172; and Hawke v. Smith, etc., 253 U. S. 221, 40 S. Ct. 495, 64 L. Ed. 871, 10 A. L. R. 1504, Congress itself has recognized referendums provided for by State Constitutions as part of the legislative authority of the State. Moreover, if we were inclined to rest our decision upon the holdings of the State Appellate Courts, we should attach weight to the annotation on the validity, construction, and effect of "absentee voters" laws found in 14 A. L. R., beginning at page 1257, from which we quote:

"As subsequently shown, most of the soldier voting laws, so called, enacted before or during the Civil War, were, so far as concerned state officers, found to be obnoxious to some provision of the state Constitution; but as the Federal Constitution provides that each state shall appoint, in such manner as the 'legislature' thereof may direct, electors of President and Vice-President (U. S. Const. art. 2, Sect. 1) and that the times, places, and manner of holding elections for Senators and Representatives in Congress shall be prescribed in each state by the 'legislature' thereof (U. S. Const. art. 1, Sect. 4), the limitations and restrictions of the state constitutions (except so far as they may be expressly or by construction adopted by the Federal Constitution, or Congressional legislation) are held not to apply to those officers; and the acts or proposed acts in question, both those of the Civil War period and recent times, whether upheld as to state officers or not, have been upheld as to electors of President and Vice-president, and with one exception, subsequently referred to, as to representatives in Congress. Baldwin v. Trowbridge, 1866 2 Bartlett, Contested Election Cas. 46 (Representatives); Opinion of Justices, 1864, 45 N. H. 695 (electors and Representatives); Re Opinion of Justices, 1921, 80 N. H. 595, 113 A. 293 (electors; but see infra as to Representatives and Senators); Opinion of Justices, 1865, 37 Vt. 665 [Appendix] (electors and Representatives.)

"Thus the same statute that, as applied to state officers, had been held unconstitutional by the Michigan

supreme court (People ex rel. Twitchell v. Blodgett, 1865, 13 Mich. 127, infra) was upheld as to a Representative in Congress by the Committee of electors of the House, on the ground that it was provided in the Federal Constitution that the time, places, and manner of holding elections for Senators and Representatives shall be prescribed in each State by the legislature thereof, and that the term 'legislature' as used in this provision means the legislature eo nomine as known in the political history of the country. And the view was also expressed that if the term 'legislature' as used in this provision is to be taken in its most enlarged sense as the legislative power of the state, which would include a constitutional convention, still the law would be valid, as the power given by the Federal Constitution is a continuing one, and a legislative body cannot bind its successors.

"It will be observed, however, that if a provision of the state Constitution may properly be regarded as relating to the qualifications of the electors of the most numerous branch of the state legislature, an act of the state legislature in violation thereof is invalid as to Representatives and United States Senators, since the Federal Constitution, with reference to Representatives (U. S. Const. art. 1, sect. 2) and United States Senators (art. 17, Amendment U. S. Const.) provides that the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature. And so, while the legislature was advised in Opinion of Justices, 1921, 80 N. H. 595, 113 A. 293, supra, that a proposed absentee voting bill, if enacted, would be a valid exercise of legislative power so far as applicable to the choice of presidential electors, the opinion was expressed (contrary to the advice given in Opinion of Justices, 1864, 45 N. H. 595, as to Representatives) that it would not be so as to Representatives and Senators in Congress, since, in the opinion of the Justices, the provisions of the State Constitution, construed to require the voting to be in person at the place and time specified, which would render the proposed act invalid as to state officers related to the qualification of electors, and would therefore invalidate the proposed act even as applied to Senators and Representatives in Congress."

Of course, if being present at the polls and casting one's ballot in person is a "qualification," within the

meaning of Clause 1, Sect. 2 of Article I of the Federal Constitution, which provides that voters in each state for members of the House of Representatives (and since the 17th Amendment, United States Senators) shall have the qualifications requisite for electors of members of the most numerous branch of the State Legislature, so much of the Act under consideration as pertains to absentee voting in Congressional elections, is unconstitutional, since it permits absent members of the State's Electorate who are prohibited by the State Constitution from voting for State Legislators to vote in Congressional elections. But, notwithstanding the last of the several Opinions of the Justices of New Hampshire (80 N. H. 595, 113 A. 293) negating their former and opposite conclusions (45 N. H. 595), and their expression of doubt on the subject (80 N. H. 595, 113 A. 293), we are inclined to the belief that qualifications as used in Sect. 2 of Art. I of the Federal Constitution means natural endowments or requirements which fit a person for a place, office or employment, or as an elector, and that restrictions on the right of a voter to vote because of his failure to register or to vote in a particular manner at a certain time and place, are limitations on the right, and not on the qualification to exercise it. Under this concept, the Congress has the power to abrogate all State laws and Constitutional provisions which prescribe the method by which an otherwise qualified elector may cast his ballot in Congressional elections, although it may not interfere with the method designated by a State Legislature for the appointment of Presidential Electors. Ex Parte Siebold et al., 100 U. S. 371, 25 L. Ed. 717. And that Congress must have so construed the meaning of ''qualifications'' as used in Section 2 of Article I is at least presumable from the fact that by the Act of September 16, 1942, Chap. 561 Title 1, Sects. 3 to 15, 50 U. S. C. A. secs. 303-315, it attempted to confer on members of the Armed Forces in time of War the right to vote for Presidential Electors, United States Senators and Representatives, regardless of the provisions of State laws, and by the amendment of March 31, 1944, recommended to the states the adoption of legislation which would authorize such ''absentee voting'' in all elections.

We possess no certainty that our indicated conclusions as to the constitutionality of the Act under consideration are correct, nor do we believe that a more

exhaustive examination of the authorities than we have been able to make in the short time elapsing between the date on which the case was presented and the date on which it must be decided in order to render the Act available for the approaching election would have removed the doubt which we, apparently in common with most of the writers on the subject, entertain.

And this brings us to the one sure foundation on which we are able to rest our decision, the axiomatic principle that all doubts as to the constitutionality of a legislative enactment should be resolved in favor of its constitutionality, a principle peculiarly applicable when, as here, an erroneous judicial nullification could not be remedied by an appeal to the final tribunal in time to avert the destruction of valuable rights attempted to be conferred by the Act upon many citizens. We are further persuaded that our course is correct by the genius of the time which points increasingly to the sacredness of the Constitutional guarantees of the right of all adult Americans, without discrimination by the States, to voice their choice of Representatives. Smith, Petitioner, v. Allwright, 64 S. Ct. 757, 88 L. Ed. —.

It is contended that the Act under consideration also violates Section 6 of the State Constitution guaranteeing free and equal elections, because some of the counties have installed voting machines for use in certain of their precincts, and the Act provides no method of registering "absentee" ballots on such machines and requires them to be deposited in "the regular ballot box;" but this contention may be disposed of with the statement that we find nothing in the Constitution or Statutes which would prohibit the use of a "regular ballot box" for the deposit of "absentee" ballots in precincts where voting machines are employed. In fact, it would seem that a broad interpretation of the Act would require that the county official charged with the duty of furnishing ballot boxes in the other precincts should likewise furnish ballot boxes for the deposit of absentee ballots in precincts where voting machines are installed.

The query of the Attorney General, "From what source shall the funds come to carry out its (the Act's) provisions?," has been answered by the provision for that purpose contained in the General Budget Act of the recently adjourned special session of the General Assembly.

It follows that the judgment appealed from, except Paragraphs 3 and 4 directing the Governor and Commissioner of Finance to make available the funds necessary to the enforcement of the Act, should be, and is, affirmed.

Whole Court sitting.