Justice THOMAS, dissenting.
This case involves the federal requirement that States "accept and use," 42 U.S.C. § 1973gg-4(a)(1), the federal voter registration form created pursuant to the National Voter Registration Act (NVRA). The Court interprets "accept and use," with minor exceptions, to require States to register *23 any individual who completes and submits the federal form. It, therefore, holds that § 1973gg-4(a)(1) pre-empts an Arizona law requiring additional information to register. As the majority recognizes, ante, at 2257 - 2259, its decision implicates a serious constitutional issue- *2262 whether Congress has power to set qualifications for those who vote in elections for federal office.
I do not agree, and I think that both the plain text and the history of the Voter Qualifications Clause, U.S. Const., Art. I, § 2, cl. 1, and the Seventeenth Amendment authorize States to determine the qualifications of voters in federal elections, which necessarily includes the related power to determine whether those qualifications are satisfied. To avoid substantial constitutional problems created by interpreting § 1973gg-4(a)(1) to permit Congress to effectively countermand this authority, I would construe the law as only requiring Arizona to accept and use the form as part of its voter registration process, leaving the State free to request whatever additional information it determines is necessary to ensure that voters meet the qualifications it has the constitutional authority to establish. Under this interpretation, Arizona did "accept and use" the federal form. Accordingly, there is no conflict between Ariz.Rev.Stat. Ann. § 16-166(F) (West Cum.Supp. 2012) and § 1973gg-4(a)(1) and, thus, no pre-emption.
I
In 2002, Congress created the Election Assistance Commission (EAC), 42 U.S.C. § 15321 et seq., and gave it the ongoing responsibility of "develop[ing] a mail voter registration application form for elections for Federal office" "in consultation with the chief election officers of the States." § 1973gg-7(a)(2). Under the NVRA, "[e]ach State shall accept and use the mail voter registration application form" the EAC develops. § 1973gg-4(a)(1). The NVRA also states in a subsequent provision that "[i]n addition to accepting and using the form described in paragraph (1), a State *24 may develop and use a mail voter registration form ... for the registration of voters in elections for Federal office" so long as it satisfies the same criteria as the federal form. § 1973gg-4(a)(2).
Section 1973gg-7(b) enumerates the criteria for the federal form. The form "may require only such identifying information ... and other information ... as is necessary to enable the appropriate State election official to assess the eligibility of the applicant." § 1973gg-7(b)(1). The federal form must also "specif[y] each eligibility requirement (including citizenship)," "contai[n] an attestation that the applicant meets each such requirement," and "requir[e] the signature of the applicant, under penalty of perjury." §§ 1973gg-7(b)(2)(A)-(C). Insofar as citizenship is concerned, the standard federal form contains the bare statutory requirements; individuals seeking to vote need only attest that they are citizens and sign under penalty of perjury.
Arizona has had a citizenship requirement for voting since it became a State in 1912. See Ariz. Const., Art. VII, § 2. In 2004, Arizona citizens enacted Proposition 200, the law at issue in this case. Proposition 200 provides that "[t]he county recorder shall reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship." Ariz.Rev.Stat. Ann. § 16-166(F). The law sets forth several examples of satisfactory evidence, including driver's license number, birth certificate, U.S. passport, naturalization documents, and various tribal identification documents for Indians. § 16-166(F)(1)-(6).
Respondents, joined by the United States, allege that these state requirements are pre-empted by the NVRA's mandate that all States "accept and use" the federal form promulgated by the EAC. § 1973gg-4(a)(1). They contend that the phrase "accept and use" requires a State presented with a completed federal form *2263 to register the individual to vote without requiring any additional information. *25 Arizona advances an alternative interpretation. It argues that § 1973gg-4(a)(1) is satisfied so long as the State "accepts and use[s]" the federal form as part of its voter qualification process. For example, a State "accepts and use[s]" the federal form by allowing individuals to file it, even if the State requires additional identifying information to establish citizenship. In Arizona's view, it "accepts and uses" the federal form in the same way that an airline "accepts and uses" electronic tickets but also requires an individual seeking to board a plane to demonstrate that he is the person named on the ticket. Brief for State Petitioners 40. See also 677 F.3d 383, 446 (C.A.9 2012) (Rawlinson, J., concurring in part and dissenting in part) ("[M]erchants may accept and use credit cards, but a customer's production of a credit card in and of itself may not be sufficient. The customer must sign and may have to provide photo identification to verify that the customer is eligible to use the credit card").
Justice ALITO makes a compelling case that Arizona's interpretation is superior to respondents'. See post, at 2273 - 2275 (dissenting opinion). At a minimum, however, the interpretations advanced by Arizona and respondents are both plausible. See 677 F.3d, at 439 (Kozinski, C.J., concurring) (weighing the arguments). The competing interpretations of § 1973gg-4(a)(1) raise significant constitutional issues concerning Congress' power to decide who may vote in federal elections. Accordingly, resolution of this case requires a better understanding of the relevant constitutional provisions.
II
A
The Voter Qualifications Clause, U.S. Const., Art. I, § 2, cl. 1, provides that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature" in elections for the federal *26 House of Representatives. The Seventeenth Amendment, which provides for direct election of Senators, contains an identical clause. That language is susceptible of only one interpretation: States have the authority "to control who may vote in congressional elections" so long as they do not "establish special requirements that do not apply in elections for the state legislature." U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 864-865, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (THOMAS, J., dissenting); see also The Federalist No. 57, p. 349 (C. Rossiter ed. 2003) (J. Madison) ("The electors ... are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State"). Congress has no role in setting voter qualifications, or determining whether they are satisfied, aside from the powers conferred by the Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments, which are not at issue here. This power is instead expressly reposed in the States.
1
The history of the Voter Qualifications Clause's enactment confirms this conclusion. The Framers did not intend to leave voter qualifications to Congress. Indeed, James Madison explicitly rejected that possibility:
"The definition of the right of suffrage is very justly regarded as a fundamental article of republican government. It was incumbent on the convention, therefore, to define and establish this right in the Constitution. To have left it open for the occasional regulation of the Congress would have been improper ." The *2264 Federalist No. 52, at 323 (emphasis added).
Congressional legislation of voter qualifications was not part of the Framers' design.
The Constitutional Convention did recognize a danger in leaving Congress "too dependent on the State governments" by allowing States to define congressional elector qualifications *27 without limitation. Ibid. To address this concern, the Committee of Detail that drafted Article I, § 2, "weighed the possibility of a federal property requirement, as well as several proposals that would have given the federal government the power to impose its own suffrage laws at some future time." A. Keyssar, The Right to Vote 18 (rev. ed. 2009) (hereafter Keyssar); see also 2 The Records of the Federal Convention of 1787, pp. 139-140, 151, 153, 163-165 (M. Farrand rev. ed. 1966) (text of several voter qualification provisions considered by the Committee of Detail).
These efforts, however, were ultimately abandoned. Even if the convention had been able to agree on a uniform federal standard, the Framers knew that state ratification conventions likely would have rejected it. Madison explained that "reduc[ing] the different qualifications in the different States to one uniform rule would probably have been as dissatisfactory to some of the States as it would have been difficult to the convention." The Federalist No. 52, at 323; see also J. Story, Commentaries on the Constitution of the United States 217 (abridged ed. 1833) (same). Justice Story elaborated that setting voter qualifications in the Constitution could have jeopardized ratification, because it would have been difficult to convince States to give up their right to set voting qualifications. Id., at 216, 218-219. See also Keyssar 306-313 (Tables A.1 and A.2) (state-by-state analysis of 18th- and 19th-century voter qualifications, including property, taxpaying, residency, sex, and race requirements).
The Convention, thus, chose to respect the varied state voting rules and instead struck the balance enshrined in Article I, § 2's requirement that federal electors "shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." That compromise gave States free reign over federal voter qualifications but protected Congress by prohibiting States from changing the qualifications for federal electors unless they also altered qualifications for their own legislatures. See The Federalist *28 No. 52, at 323. This balance left the States with nearly complete control over voter qualifications.
2
Respondents appear to concede that States have the sole authority to establish voter qualifications, see, e.g., Brief for Gonzalez Respondents 63, but nevertheless argue that Congress can determine whether those qualifications are satisfied. See, e.g., id., at 61. The practical effect of respondents' position is to read Article I, § 2, out of the Constitution. As the majority correctly recognizes, "the power to establish voting requirements is of little value without the power to enforce those requirements." See ante, at 2258. For this reason, the Voter Qualifications Clause gives States the authority not only to set qualifications but also the power to verify whether those qualifications are satisfied.
This understanding of Article I, § 2, is consistent with powers enjoyed by the States at the founding. For instance, ownership of real or personal property was a common prerequisite to voting, see Keyssar 306-313 (Tables A.1 and A.2). To verify that this qualification was satisfied, States might look to proof of tax payments. See C. Williamson, American Suffrage *2265 from Property to Democracy, 1760-1860, p. 32 (1960). In other instances, States relied on personal knowledge of fellow citizens to verify voter eligibility. Keyssar 24 ("In some locales, particularly in the South, voting was still an oral and public act: men assembled before election judges, waited for their names to be called, and then announced which candidates they supported"). States have always had the power to ensure that only those qualified under state law to cast ballots exercised the franchise.
Perhaps in part because many requirements (such as property ownership or taxpayer status) were independently documented and verifiable, States in 1789 did not generally "register" voters using highly formalized procedures. See id., at 122. Over time, States replaced their informal systems *29 for determining eligibility, with more formalized pre-voting registration regimes. See An Act in Addition to the Several Acts for Regulating Elections, 1800 Mass. Acts ch. 74, in Acts and Laws of the Commonwealth of Massachusetts 96 (1897) (Massachusetts' 1801 voter registration law). But modern voter registration serves the same basic purpose as the practices used by States in the Colonies and early Federal Republic. The fact that States have liberalized voting qualifications and streamlined the verification process through registration does not alter the basic fact that States possess broad authority to set voter qualifications and to verify that they are met.
B
Both text and history confirm that States have the exclusive authority to set voter qualifications and to determine whether those qualifications are satisfied. The United States nevertheless argues that Congress has the authority under Article I, § 4, "to set the rules for voter registration in federal elections." Brief for United States as Amicus Curiae 33 (hereafter Brief for United States). Neither the text nor the original understanding of Article I, § 4, supports that position.
1
Article I, § 4, gives States primary responsibility for regulating the "Times, Places and Manner of holding Elections" and authorizes Congress to "at any time by Law make or alter such Regulations."[1] Along with the Seventeenth Amendment, this provision grants Congress power only over the "when, where, and how" of holding congressional elections. T. Parsons, Notes of Convention Debates, Jan. 16, 1788, in 6 Documentary History of the Ratification of the *30 Constitution 1211 (J. Kaminski & G. Saladino eds. 2000) (hereinafter Documentary History) (Massachusetts ratification delegate Sedgwick) (emphasis omitted); see also ante, at 2257 ("Arizona is correct that [Article I, § 4,] empowers Congress to regulate how federal elections are held, but not who may vote in them").
Prior to the Constitution's ratification, the phrase "manner of election" was commonly used in England, Scotland, Ireland, and North America to describe the entire election process. Natelson, The Original Scope of the Congressional Power to Regulate Elections, 13 U. Pa. J. Constitutional L. 1, 10-18 (2010) (citing examples). But there are good reasons for concluding that Article I, § 4's use of "Manner" is considerably more limited. Id., at 20. The Constitution does not use the word "Manner" in isolation; rather, "after providing *2266 for qualifications, times, and places, the Constitution described the residuum as 'the Manner of holding Elections.' This precise phrase seems to have been newly coined to denote a subset of traditional 'manner' regulation." Ibid. (emphasis deleted; footnote omitted). Consistent with this view, during the state ratification debates, the "Manner of holding Elections" was construed to mean the circumstances under which elections were held and the mechanics of the actual election. See 4 Debates in the Several State Conventions on the Adoption of the Federal Constitution 71 (J. Elliot 2d ed. 1863) (hereafter Elliot's Debates) ("The power over the manner of elections does not include that of saying who shall vote ... the power over the manner only enables them to determine how those electors shall elect-whether by ballot, or by vote, or by any other way" (John Steele at the North Carolina ratification debates)); A Pennsylvanian to the New York Convention, Pennsylvania Gazette, June 11, 1788, in 20 Documentary History 1145 (J. Kaminski, G. Saladino, R. Leffler, & C. Schoenleber eds. 2004) (same); Brief for Center for Constitutional Jurisprudence as Amicus Curiae *31 6-7 (same, citing state ratification debates). The text of the Times, Places and Manner Clause, therefore, cannot be read to authorize Congress to dictate voter eligibility to the States.
2
Article I, § 4, also cannot be read to limit a State's authority to set voter qualifications because the more specific language of Article I, § 2, expressly gives that authority to the States. See ante, at 2258 ("One cannot read [Article I, § 4,] as treating implicitly what [Article I, § 2, and Article II, § 1,] regulate explicitly"). As the Court observed just last Term, "[a] well established canon of statutory interpretation succinctly captures the problem: '[I]t is a commonplace of statutory construction that the specific governs the general.' " RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. ----, ----, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012) (quoting Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ; second alteration in original). The Court explained that this canon is particularly relevant where two provisions " 'are interrelated and closely positioned, both in fact being parts of [the same scheme.]' " 566 U.S., at ----, 132 S.Ct., at 2071 (quoting HCSC-Laundry v. United States, 450 U.S. 1, 6, 101 S.Ct. 836, 67 L.Ed.2d 1 (1981) (per curiam )). Here, the general Times, Places and Manner Clause is textually limited by the directly applicable text of the Voter Qualification Clause.
The ratification debates over the relationship between Article I, §§ 2 and 4, demonstrate this limitation. Unlike Article I, § 2, the Times, Places and Manner Clause was the subject of extensive ratification controversy. Antifederalists were deeply concerned with ceding authority over the conduct of elections to the Federal Government. Some antifederalists claimed that the " 'wealthy and the well-born,' " might abuse the Times, Places and Manner Clause to ensure their continuing power in Congress. The Federalist No. 60, at 368. Hamilton explained why Article I, § 2's Voter Qualifications Clause foreclosed this argument:
*32 "The truth is that there is no method of securing to the rich the preference apprehended but by prescribing qualifications of property either for those who may elect or be elected. But this forms no part of the power to be conferred upon the national government. Its authority would be expressly restricted to the regulation of the times, the places, and the manner of elections." Id., at 369.
*2267 Ratification debates in several States echoed Hamilton's argument. The North Carolina debates provide a particularly direct example. There, delegate John Steele relied on the established "maxim of universal jurisprudence, of reason and common sense, that an instrument or deed of writing shall be construed as to give validity to all parts of it, if it can be done without involving any absurdity" in support of the argument that Article I, § 2's grant of voter qualifications to the States required a limited reading of Article I, § 4. 4 Elliot's Debates 71.
This was no isolated view. See 2 id., at 50-51 (Massachusetts delegate Rufus King observing that "the power of control given by [Article I, § 4,] extends to the manner of election, not the qualifications of the electors"); 4 id., at 61 (same, North Carolina's William Davie); 3 id., at 202-203 (same, Virginia delegate Edmund Randolph); Roger Sherman, A Citizen of New Haven: Observations on the New Federal Constitution, Connecticut Courant, Jan. 7, 1788, in 15 Documentary History 282 (J. Kaminski & G. Saladino eds. 1983) (same); A Freeman [Letter] II (Tench Coxe), Pennsylvania Gazette, Jan. 30, 1788, in id., at 508 (same). It was well understood that congressional power to regulate the "Manner" of elections under Article I, § 4, did not include the power to override state voter qualifications under Article I, § 2.
3
The concern that gave rise to Article I, § 4, also supports this limited reading. The Times, Places and Manner Clause *33 was designed to address the possibility that States might refuse to hold any federal elections at all, eliminating Congress, and by extension the Federal Government. As Hamilton explained, "every government ought to contain in itself the means of its own preservation." The Federalist No. 59, at 360 (emphasis deleted); see also U.S. Term Limits, Inc., 514 U.S., at 863, 115 S.Ct. 1842 (THOMAS, J., dissenting) (Article I, § 4, designed "to ensure that the States hold congressional elections in the first place, so that Congress continues to exist"); id., at 863, and n. 10, 115 S.Ct. 1842 (same, citing ratification era sources). Reflecting this understanding of the reasoning behind Article I, § 4, many of the original 13 States proposed constitutional amendments that would have strictly cabined the Times, Places and Manner Clause to situations in which state failure to hold elections threatened the continued existence of Congress. See 2 Elliot's Debates 177 (Massachusetts); 18 Documentary History 71-72 (J. Kaminski & G. Saladino eds. 1995) (South Carolina); id., at 187-188 (New Hampshire); 3 Elliot's Debates 661 (Virginia); Ratification of the Constitution by the State of New York (July 26, 1788) (New York), online at http://avalon.law.yale.edu/18th_century/ratny.asp (all Internet materials as visited June 6, 2013, and available in Clerk of Court's case file); 4 Elliot's Debates 249 (North Carolina); Ratification of the Constitution by the State of Rhode Island (May 29, 1790) (Rhode Island), online at http://avalon.law.yale. edu/18th_century/ratri.asp. Although these amendments were never enacted, they underscore how narrowly the ratification conventions construed Congress' power under the Times, Places and Manner Clause. In contrast to a state refusal to hold federal elections at all, a state decision to alter the qualifications of electors for state legislature (and thereby for federal elections as well) does not threaten Congress' very existence.
C
Finding no support in the historical record, respondents and the United States instead chiefly assert that this Court's *34 precedents involving the Times, Places and Manner Clause give Congress authority *2268 over voter qualifications. See, e.g., Brief for Respondent Inter Tribal Council of Arizona, Inc. (ITCA) et al. 30-31, 48-50 (hereafter Brief for ITCA Respondents); Brief for Gonzalez Respondents 44-50; Brief for United States 24-27, 31-33. But this Court does not have the power to alter the terms of the Constitution. Moreover, this Court's decisions do not support the respondents' and the Government's position. Respondents and the United States point out that Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932), mentioned "registration" in a list of voting-related subjects it believed Congress could regulate under Article I, § 4. Id., at 366, 52 S.Ct. 397 (listing "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns" (emphasis added)). See Brief for ITCA Respondents 49; Brief for Gonzalez Respondents 48; Brief for United States 21. But that statement was dicta because Smiley involved congressional redistricting, not voter registration. 285 U.S., at 361-362, 52 S.Ct. 397. Cases since Smiley have similarly not addressed the issue of voter qualifications but merely repeated the word "registration" without further analysis. See Cook v. Gralike, 531 U.S. 510, 523, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001) ; Roudebush v. Hartke, 405 U.S. 15, 24, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972).
Moreover, in Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), a majority of this Court, "took the position that [Article I, § 4,] did not confer upon Congress the power to regulate voter qualifications in federal elections," as the majority recognizes. Ante, at 2258, n. 8. See Mitchell, 400 U.S., at 288, 91 S.Ct. 260 (Stewart, J., concurring in part and dissenting in part); id., at 210-212, 91 S.Ct. 260 (Harlan, J., concurring in part and dissenting in part); id., at 143, 91 S.Ct. 260 (opinion of Douglas, J.). And even the majority's decision in U.S. Term Limits, from which I dissented, recognized that Madison's Federalist No. 52 "explicitly contrasted the state control over the qualifications of *35 electors " with what it believed was "the lack of state control over the qualifications of the elected." 514 U.S., at 806, 115 S.Ct. 1842 (emphasis added). Most of the remaining cases cited by respondents and the Government merely confirm that Congress' power to regulate the "Manner of holding Elections" is limited to regulating events surrounding the when, where, and how of actually casting ballots. See, e.g., United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) (upholding federal regulation of ballot fraud in primary voting); Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884) (upholding federal penalties for intimidating voter in congressional election); see also Foster v. Love, 522 U.S. 67, 118 S.Ct. 464, 139 L.Ed.2d 369 (1997) (overturning Louisiana primary system whose winner was deemed elected if he received a majority of votes in light of federal law setting the date of federal general elections); Roudebush, supra (upholding Indiana ballot recount procedures in close Senate election as within state power under Article I, § 4). It is, thus, difficult to maintain that the Times, Places and Manner Clause gives Congress power beyond regulating the casting of ballots and related activities, even as a matter of precedent.[2] *2269 III
A
*36 Arizona has not challenged the constitutionality of the NVRA itself in this case. Nor has it alleged that Congress lacks authority to direct the EAC to create the federal form. As a result, I need not address those issues. Arizona did, however, argue that respondent's interpretation of § 1973gg-4(a)(1) would raise constitutional concerns. As discussed, supra, I too am concerned that respondent's interpretation of § 1973gg-4(a)(1) would render the statute unconstitutional under Article I, § 2. Accordingly, I would interpret § 1973gg-4(a)(1) to avoid the constitutional problems discussed above. See Zadvydas v. Davis, 533 U.S. 678, 689, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001) (" '[I]t is a cardinal principle' of statutory interpretation, however, that when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided' " (quoting Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932) )).
I cannot, therefore, adopt the Court's interpretation that § 1973gg-4(a)(1)'s "accept and use" provision requires states to register anyone who completes and submits the form. Arizona sets citizenship as a qualification to vote, and it wishes to verify citizenship, as it is authorized to do under Article 1, § 2. It matters not whether the United States has specified one way in which it believes Arizona might be able to verify citizenship; Arizona has the independent constitutional authority to verify citizenship in the way it deems necessary. See in Part II-A-2, supra . By requiring Arizona to register people who have not demonstrated to Arizona's satisfaction that they meet its citizenship qualification for voting, the NVRA, as interpreted by the Court, would exceed *37 Congress' powers under Article I, § 4, and violate Article 1, § 2.
Fortunately, Arizona's alternative interpretation of § 1973gg-4(a)(1) avoids this problem. It is plausible that Arizona "accept[s] and use[s]" the federal form under § 1973gg-4(a)(1) so long as it receives the form and considers it as part of its voter application process. See post, at 2273 - 2275 (ALITO, J., dissenting); 677 F.3d, at 444 (Rawlinson, J., concurring in part and dissenting in part); 624 F.3d 1162, 1205-1208 (C.A.9 2010) (Kozinski, C.J., dissenting in part), reh'g 649 F.3d 953 (C.A.9 2011) ; 677 F.3d, at 439 (Kozinski, C.J., concurring) (same). Given States' exclusive authority to set voter qualifications and to determine whether those qualifications are met, I would hold that Arizona *2270 may request whatever additional information it requires to verify voter eligibility.
B
The majority purports to avoid the difficult constitutional questions implicated by the Voter Qualifications Clause. See ante, at 2257 - 2259. It nevertheless adopts respondents' reading of § 1973gg-4(a)(1) because it interprets Article I, § 2, as giving Arizona the right only to "obtai[n] information necessary for enforcement" of its voting qualifications. Ante, at 2258 - 2259. The majority posits that Arizona may pursue relief by making an administrative request to the EAC that, if denied, could be challenged under the Administrative Procedure Act (APA). Ante, at 2259 - 2260.
Justice ALITO is correct to point out that the majority's reliance on the EAC is meaningless because the EAC has no members and no current prospects of new members. Post, at 2273 (dissenting opinion). Offering a nonexistent pathway to administrative relief is an exercise in futility, not constitutional avoidance.
Even if the EAC were a going concern instead of an empty shell, I disagree with the majority's application of the constitutional avoidance canon. I would not require Arizona to *38 seek approval for its registration requirements from the Federal Government, for, as I have shown, the Federal Government does not have the constitutional authority to withhold such approval. Accordingly, it does not have the authority to command States to seek it. As a result, the majority's proposed solution does little to avoid the serious constitutional problems created by its interpretation.
* * *
Instead of adopting respondents' definition of "accept and use" and offering Arizona the dubious recourse of bringing an APA challenge within the NVRA framework, I would adopt an interpretation of § 1973gg-4(a)(1) that avoids the constitutional problems with respondents' interpretation. The States, not the Federal Government, have the exclusive right to define the "Qualifications requisite for Electors," U.S. Const., Art. I, § 2, cl. 1, which includes the corresponding power to verify that those qualifications have been met. I would, therefore, hold that Arizona may "reject any application for registration that is not accompanied by satisfactory evidence of United States citizenship," as defined by Arizona law. Ariz.Rev.Stat. Ann. § 16-166(F).
I respectfully dissent.

The Court argues that Gradwell is irrelevant, observing that there was no state law directly at issue in that case, which concerned a prosecution under a federal statute. Ante, at 2256, n. 5. But the same is true of Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1880), on which the Court relies in the very next breath. In any event, it is hard to see why a presumption about the effect of federal law on the conduct of congressional elections should have less force when the federal law is alleged to conflict with a state law. If anything, one would expect the opposite to be true.

The Court observes that the Commerce Clause, unlike the Elections Clause, empowers Congress to legislate in areas that do not implicate concurrent state power. Ante, at 2257, n. 6. Apparently the Court means that the presumption against pre-emption only applies in those unusual cases in which it is unclear whether a federal statute even touches on subject matter that the States may regulate under their broad police powers. I doubt that the Court is prepared to abide by this cramped understanding of the presumption against pre-emption. See, e.g., Hillman v. Maretta, 569 U.S. ----, ----, 133 S.Ct. 1943, 1950, 186L.Ed.2d 43 (2013) ("There is therefore 'a presumption against pre-emption' of state laws governing domestic relations" (quoting Egelhoff v. Egelhoff, 532 U.S. 141, 151, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001) )).