**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : No. 7 MM 2022<br>:<br>:<br>: ARGUED: February 18, 2022<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Petitioners | :<br>:<br>: |
| v. | :<br>:<br>:<br>: |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Respondents | :<br>:<br>: |
| ------------------------------------------------------- | :<br>: |
| PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| Petitioners | :<br>:<br>: |
| v. | :<br>:<br>:<br>: |

LEIGH M. CHAPMAN, IN HER OFFICIAL      :
CAPACITY AS THE ACTING SECRETARY       :
OF THE COMMONWEALTH OF                 :
PENNSYLVANIA; JESSICA MATHIS, IN       :
HER OFFICIAL CAPACITY AS DIRECTOR      :
FOR THE PENNSYLVANIA BUREAU OF         :
ELECTION SERVICES AND NOTARIES,        :
                                       :
            Respondents                :

## CONCURRING OPINION

OPINION FILED:  March 9, 2022
DECIDED:  February 23, 2022

**JUSTICE WECHT**

I join the Court's adoption of the Carter Plan as the Commonwealth's 2022 Congressional Redistricting Plan, as well as its opinion in support thereof.  I write separately to further explain why I found a number of exceptions to the Special Master's Report and Recommendation to be meritorious, and also to offer a more detailed discussion regarding the "least-change" approach, the "subordinate historical consideration" that tipped the scales in favor of the Carter Plan.

Although "the primary responsibility and authority for drawing" the Commonwealth's congressional districts "rests squarely" with the General Assembly,[1] the long-standing practice of the state and federal courts counsels judicial intervention when the political branches fail to timely enact a congressional districting plan and "when further delay" threatens to "disrupt the election process."[2]  As the recent flurry of activity involving

---

[1]      *League of Women Voters v. Commonwealth*, 178 A.3d 737, 821 (Pa. 2018) ("*LWV II*").

[2]      *Branch v. Smith*, 538 U.S. 254, 279 (2003) (plurality); *cf. LWV II*, 178 A.3d at 822 ("When . . . the legislature is unable or chooses not to act, it becomes the judiciary's role to determine the appropriate redistricting plan."); *Scott v. Germano*, 381 U.S. 407, 409 (1965) (*per curiam*) ("The power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but (continued…)

requested modifications to the primary election calendar demonstrates, delaying our consideration of this case any longer likely would have impeded the orderly administration of this year's elections to the detriment of voters and candidates alike. Alas, though our task may be an "unwelcome" one,[3] it is not unfamiliar to this Court.[4]

Preliminarily, I concur with the Court's evaluation of the pertinent systemic exceptions taken by a number of Parties and *Amicus* Participants to the Special Master's Report and Recommendation ("Report"). Chief among those exceptions, in my view, is the Special Master's treatment of House Bill 2146 as "functionally tantamount to the voice and will of the People,"[5] which fundamentally misapprehends the Governor's role as "an integral part of the lawmaking power of the state."[6]

With respect to the redistricting process, it is well-settled that the authority vested in each State's Legislature to prescribe "[t]he Times, Places and Manner of holding

---

appropriate action by the States in such cases has been specifically encouraged."); *Growe v. Emison*, 507 U.S. 25, 33-34 (1993) (observing that, "[i]n the reapportionment context, the Court has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative *or* judicial branch, has begun to address that highly political task itself," and instructing federal courts to "neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it" "[a]bsent evidence that these state branches will fail timely to perform that duty") (emphasis in original); *Butcher v. Bloom*, 216 A.2d 457, 459 (Pa. 1966) (noting that the Court selected redistricting plans for the Pennsylvania House and Senate after "[t]he deadline set forth in our earlier opinion passed without [the] enactment of the required legislation").

[3]     *LWV II*, 178 A.3d at 823 (quoting *Connor v. Finch*, 431 U.S. 407, 415 (1977)).

[4]     *See generally LWV II*, *supra* note 1; *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992) (assuming plenary jurisdiction of redistricting impasse litigation arising from the political branches' failure to cure malapportioned congressional map in the wake of the Commonwealth's loss of two congressional seats following the 1990 decennial census).

[5]     Report at 214-15.

[6]     *Commonwealth ex rel. Attorney General v. Barnett*, 48 A. 976, 976 (Pa. 1901).

Elections for . . . Representatives"—which remains subject to Congress' plenary power to "make or alter such Regulations" "at any time by Law"[7]—"involves lawmaking in its essential features and most important aspect."[8] As such, the United States Supreme Court has admonished that "the exercise of th[at] authority must be in accordance with the method which the state has prescribed for legislative enactments."[9] In other words, the Legislature has no "power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted."[10]

Unlike those jurisdictions that have enshrined certain aspects of the congressional redistricting process in their respective state constitutions,[11] Pennsylvania's charter is silent on the subject. As in most States, redistricting in Pennsylvania typically is carried out through the traditional legislative process.[12] That is significant, because the

---

[7]     U.S. CONST. art. I, § 4 (hereinafter, "Elections Clause").

[8]     *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

[9]     *Id.* at 367; *see also Hawke v. Smith*, 253 U.S. 221, 230 (1920) (distinguishing the "power to ratify a proposed amendment to the" U.S. Constitution, which a State "derives" from the Fifth Article thereof, from "the power to legislate in the enactment of the laws of a state," which "is derived from the people of the state").

[10]    *Smiley*, 285 U.S. at 367-68.

[11]    *See, e.g.*, ARIZ. CONST. art. IV, pt. 2, § 1; CAL. CONST. art. XXI; COLO. CONST. art. V, §§ 44-48; HAW. CONST. art. IV, § 2; IDAHO CONST. art. III, § 2; MICH. CONST. art. IV, § 6; MONT. CONST. art. V, § 14; N.J. CONST. art. II, § II; N.Y. CONST. art. III, § 4; OHIO CONST. art. XIX; UTAH CONST. art. IX, § 1; VA. CONST. art. II, §§ 6, 6-A; WASH. CONST. art. II, § 43.

[12]    The High Court considered the validity of non-traditional exercises of legislative power in the redistricting sphere in *Ohio ex rel. Davis v. Hildebrant*, 241 U.S. 565 (1916), which concerned a challenge to a 1912 amendment to the Constitution of Ohio that expressly reserved to the people of that State the concurrent right to exercise the legislative power "by way of referendum"—*i.e.*, "to approve or disapprove by popular vote any law enacted by the [G]eneral [A]ssembly." *Id.* at 566. In May 1915, the Ohio General Assembly passed, and the Governor of Ohio signed into law, an act redistricting the State into twenty-two congressional districts. When voters subsequently disapproved of the act (continued…)

Governor's constitutionally designated role in the legislative process ought not to be treated as an afterthought. More specifically, the Presentment Clause and the

in a statewide referendum, challengers unsuccessfully sought a writ of *mandamus* from the Supreme Court of Ohio directing election officials to disregard the vote on the grounds that it violated the Elections Clause and thus was void. *See id.* at 567.

The U.S. Supreme Court affirmed the denial of relief for three interrelated reasons. First, the Court explained that "the referendum constituted a part of the state Constitution and laws," and therefore "was contained within the legislative power" of the State. *Id.* at 568. Next, it observed that in 1911, Congress had, by statute,

> expressly modified the phraseology of the previous acts relating to [redistricting] by inserting a clause [which directed that redistricting should be performed by a State 'in the manner provided by the laws thereof'] plainly intended to provide that where, by the state Constitution and laws, the referendum was treated as part of the legislative power, the power as thus constituted should be held and treated to be the state legislative power for the purpose of creating congressional districts by law.

*Id.* Lastly, the Court reasoned that any contention that Congress exceeded its constitutional authority in sanctioning use of the referendum

> for the purpose of apportionment . . . must rest upon the assumption that to include the referendum in the scope of the legislative power is to introduce a virus which destroys that power, which in effect annihilates representative government, and causes a state where such condition exists to be not republican in form, in violation of the guaranty of the Constitution . . . [which] presents no justiciable controversy.

*Id.* at 569 (citing U.S. Const. art. 4, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government . . . .")); *cf. Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 795 n.3 (2015) ("The people's sovereign right to incorporate themselves into a State's lawmaking apparatus, by reserving for themselves the power to adopt laws and to veto measures passed by elected representatives, is one this Court has ranked a nonjusticiable political matter."). In short, neither Ohioans' decision to overrule a duly enacted congressional redistricting plan by statewide vote, nor Congress' recognition of their authority to do so in 1911, were "repugnant" to the Constitution. *Id.* As far as I am aware, Pennsylvania has not utilized referenda for redistricting purposes.

gubernatorial veto[13] have been critical features of our Commonwealth's tripartite system

of government for nearly two-and-a-half centuries.[14]

---

[13] *Compare* PA. CONST. art. IV, § 15 ("Every bill which shall have passed both Houses shall be presented to the Governor; if he approves he shall sign it, but if he shall not approve he shall return it with his objections to the House in which it shall have originated . . . ."), *with* PA. CONST. (1790) art. I, § 22 ("Every bill which shall have passed both Houses, shall be presented to the Governor; if he approve, he shall sign it; but if he shall not approve it, he shall return it, with his objections, to the House in which it shall have originated . . . ."). As this Court has explained,

> The veto power is a survival of the lawmaking authority vested in the king as a constituent if not a controlling third body of the parliament, in which he might and not infrequently did sit in person. With the growth of free ideas and institutions, and the aggressive spirit of the popular branch of the parliament in the affairs of government, it lost its vitality as a real power in England. . . . But in the colonies it not only existed, but was an active power, absolute in character, and so constantly exercised that . . . the Declaration of Independence set forth first among the grievances of the colonies, "He has refused his Assent to Laws, the most wholesome and necessary for the public good."
>
> \* \* \*
>
> From the colonies the power passed, with various limitations, into nearly all the American constitutions, state and national. Originally intended mainly as a means of self-protection by the executive against the encroachments of the legislative branch, it has steadily grown in favor with the increasing multitude and complexity of modern laws, as a check upon hasty and inconsiderate as well as unconstitutional legislation.

*Barnett*, 48 A. at 976-77 (quotation from Declaration of Independence modified).

[14] While the classical view of the separation of powers might regard the veto power as an inherent feature of our system of checks and balances, this was not always the case. By the time the United States Constitution was ratified in 1789, "it appears that only two states had provided for a veto upon the passage of legislative bills; Massachusetts, through the Governor, and New York, through a council of revision." *Smiley*, 285 U.S. at 368. In fact, not only did Pennsylvania's "radically democratic" founding era constitution, which governed from 1776 to 1790, fail to provide a mechanism for contemporaneous disapproval of laws passed by the unicameral legislature, it vested the "supreme executive power" in a council of twelve people. *LWV II*, 178 A.3d at 802 (quoting Ken Gormley, *Overview of Pennsylvania Constitutional Law*, as appearing in Ken Gormley, ed., THE PENNSYLVANIA CONSTITUTION: A TREATISE ON RIGHTS AND LIBERTIES, 3 (2004)); PA. CONST. (1776) ch. II, § 4 ("The supreme executive power shall be vested in a president and council").

Reflecting on the redistricting process early in the twentieth century, in *Smiley*, the Supreme Court observed that "the uniform practice" among the States in such matters "has been to provide for congressional districts by the enactment of statutes with the participation of the Governor wherever the state Constitution provided for such participation as part of the process of making laws."[15] To that end, the Court has observed:

> [W]hether the Governor of the State, through the veto power, shall have a part in the making of state laws, is a matter of state polity. Article I, Section 4 of the Federal Constitution neither requires nor excludes such participation. And provision for it, as a check in the legislative process, cannot be regarded as repugnant to the grant of legislative authority. . . . That the state Legislature might be subject to such a limitation, either [at the time of the adoption of the Federal Constitution] or thereafter imposed as the several states might think wise, was no more incongruous with the grant of legislative authority to regulate congressional elections than the fact that the Congress in making its regulations under the same provision would be subject to the veto power of the President, as provided in Article I, Section 7. The latter consequence was not expressed, but there is no question that it was necessarily implied, as the Congress was to act by law; and there is no intimation, either in the debates in the Federal Convention or in contemporaneous exposition, of a purpose to exclude a similar restriction imposed by state Constitutions upon state Legislatures when exercising the lawmaking power.[16]

---

[15] *Smiley*, 285 U.S. at 370.

[16] *Id.* at 368-69 (cleaned up). Regarding the particular role of the Elections Clause in our federal system, the High Court offered the following:

> The practical construction of Article I, Section 4 is impressive. General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political rights, and hence subject to constant and careful scrutiny. Certainly, the terms of the constitutional provision furnish no such clear and definite support for a contrary construction as to justify disregard of the established practice in the States. That practice is eloquent of the conviction of the people of the States, and of their representatives in state Legislatures and executive

(continued…)

The Supreme Court reaffirmed the validity of these and other state constitutional constraints on the congressional redistricting process most recently in *Arizona State Legislature v. Arizona Independent Redistricting Commission*. There, the Court relied upon the Elections Clause and 2 U.S.C. § 2a(c), the successor statute to the 1911 Act at issue in *Hildebrant*, in rejecting a challenge to a provision of the Arizona Constitution, adopted in 2000 via citizen initiative, that "remove[d] redistricting authority from the Arizona Legislature and vest[ed] that authority in an independent commission."[17] Tracing the history of the federal statutes, the Court explained:

> From 1862 through 1901, the decennial congressional apportionment Acts provided that a State would be required to follow federally prescribed procedures for redistricting unless "the legislature" of the State drew district lines. In drafting the 1911 Act, Congress focused on the fact that several States had supplemented the representative legislature mode of lawmaking with a direct lawmaking role for the people, through the process of initiative (positive legislation by the electorate) and referendum (approval or disapproval of legislation by the electorate). To accommodate that development, the 1911 Act eliminated the statutory reference to redistricting by the state "legislature" and instead directed that, if a State's apportionment of Representatives increased, the State should use the Act's default procedures for redistricting "until such State shall be redistricted *in the manner provided by the laws thereof*."[18]

---

> office, that in providing for congressional elections and for the districts in which they were to be held, these Legislatures were exercising the lawmaking power and thus subject, where the state Constitution so provided, to the veto of the Governor as a part of the legislative process.

*Id.* (citations omitted).

[17]    576 U.S. at 792.

[18]    *Id.* at 809 (cleaned up; emphasis in original). "The 1911 Act also required States to comply with certain federally prescribed districting rules—namely that Representatives be elected 'by districts composed of a contiguous and compact territory, and containing as nearly as practicable an equal number of inhabitants.'" *Id.* at 809 n.19 (quoting Act of Aug. 8, 1911, ch. 5, § 3, 37 Stat. 14); *see also id.* ("The 1911 Act did not address (continued…)

Because the "lawmaking power in Arizona include[d] the initiative process," the establishment of an independent commission for purposes of congressional redistricting offended neither the Elections Clause nor Section 2a(c).[19]

Taken together, the foregoing authority undercuts the Special Master's suggestion that House Bill 2146 should be entitled to some special consideration, let alone "revere[nce],"[20] simply by virtue of its adoption by the General Assembly. As I see it, there is no better embodiment of the People's will than the language of the Constitution itself, and that text is clear: without the Governor's signature or a two-thirds vote of the House

---

redistricting in the event a State's apportionment of Representatives decreased, likely because no State faced a decrease following the 1910 census.").

Notably, requirements virtually identical to those enumerated in the 1911 Act had been added to Pennsylvania's Constitution by statewide referendum in 1874 to govern the redistricting process for state legislative districts, which at that time was handled by the General Assembly directly. *See* PA. CONST. (1874) art. II, §§ 16, 17; *LWV II*, 178 A.3d at 815. In 1968, Pennsylvania's voters overhauled the legislative redistricting process by amending the Constitution to commit the power to redraw those districts to the newly constituted Legislative Reapportionment Commission. By its terms, our Constitution presently requires the Commission to draw legislative districts "composed of compact and contiguous territory as nearly equal in population as practicable," and instructs that "no county, city, incorporated town, borough, township or ward shall be divided in forming" such districts "[u]nless absolutely necessary." *See* PA. CONST. art. II, § 16. In *LVW II*, we effectively incorporated a slightly modified version of those requirements into the Free and Equal Elections Clause, *id.* art. I, § 5, as "neutral criteria" to measure the constitutionality of congressional redistricting plans. *LWV II*, 178 A.3d at 816-17 (holding that "an essential part of such an inquiry is an examination of whether the congressional districts created under a redistricting plan are: 'composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, except where necessary to ensure equality of population'"). "These neutral criteria provide a 'floor' of protection for an individual against the dilution of his or her vote in the creation of such districts." *Id.* at 817.

[19]     *Id.* at 793.

[20]     Report at 215.

and Senate to override his veto, it is axiomatic that House Bill 2146 is "just a bill."[21]  While the House Bill undoubtedly encompasses the current Legislature's policy *goals*, it does not have the force of law and therefore does not constitute state policy.[22]  Were this Court to treat it as anything more than a proposal on an equal footing with the other submitted plans, we would subvert the executive power in favor of the legislative power, elevating one coordinate branch of our government over another without a historical basis.  This we cannot do.

Apart from the deference question, I also find the piecemeal treatment of discrete features of any given map as disqualifying to be problematic.  For instance, while the Special Master considered the division of Pittsburgh to be suspect, her Report says nothing about House Bill 2146's treatment of Philadelphia.  Given its size, Philadelphia is the only county in Pennsylvania that can support two ideally populated congressional districts by itself, with the remainder of its surplus population added to a third district anchored in a neighboring county.  However, House Bill 2146 is the *only* submission among the thirteen before us that divides Philadelphia into *four* districts—again without any justification along the lines of what the Special Master demanded of maps that split Pittsburgh.  Likewise, the Special Master deemed maps that "divide[d] Bucks County for the first time since the 1860s" to be "[in]appropriate choice[s]."[23]  But similar concerns were absent with respect to Dauphin County, for instance, which historically had been

---

[21]     SCHOOLHOUSE ROCK!, I'M JUST A BILL (1975).

[22]     *See Sixty-Seventh Minn. State Senate v. Beens*, 406 U.S. 187, 197 (1972).

[23]     Report at 195.

kept whole before recent redistricting cycles. Where the 2018 Remedial Map reunified the county, the House Bill would have distributed its populace among three districts.

Moreover, notwithstanding the Constitution's command that "no county, city, incorporated town, borough, township or ward shall be divided in forming" districts "[u]nless absolutely necessary," there are only three counties (one of which is coterminous with a city) in Pennsylvania that "absolutely" must be split to account for current population estimates.[24] Beyond that, the Constitution does not create a hierarchy of political subdivisions to consistently guide the evaluation of a plan's performance on this measure. Nor does it set forth intelligible standards by which courts can conclude that the integrity of some municipal boundaries are sacrosanct, while others are not. Consequently, we must choose among proposed maps without a constitutionally-prescribed basis by which to resolve citizens' pleas that certain municipalities or "communities of interest" should be kept together. Ultimately, those questions are inherently political.

While historical practices might be a helpful starting point for a court to employ when it comes to scrutinizing political subdivisions, by no means do they create what one *Amicus* Participant cleverly chided as "cartographic *stare decisis*."[25] In that vein, the Special Master erred in asserting that certain plans "propose to split the City of Pittsburgh into two districts, apparently for the first time in [Pennsylvania's] history."[26] To the contrary, Pittsburgh historically had been split between multiple congressional districts for

---

[24]     Those counties are Allegheny, Montgomery, and Philadelphia.

[25]     Br. of *Amici* Participants Khalif Ali, *et al.*, 2/14/2022, at 20.

[26]     Report at 194.

the better part of the previous century and beyond, including four districts in 1931, five in 1943, four again in 1951, and three between 1962 and 1982, to summarize just a few maps that the Legislative Reapportionment Commission conveniently has made publicly available on its website.[27]  In fact, Pittsburgh has only comprised a single congressional district since 1982.  That said, while the Constitution does not require a justification for each and every split (or any, for that matter), absent compelling reasons not present in this record, whether and how to divide Pennsylvania's second-largest city for the first time in four decades are questions best left to the political branches, which possess the institutional competencies to survey the Commonwealth, conduct fact-finding, and weigh amorphous and constitutionally-undefined concepts like "communities of interest" in deciding where lines should be drawn.

To be clear, I do not believe that any of the maps before us should be disqualified based upon discrete line-drawing decisions.  The creation of a districting plan requires balancing a number of factors, some quantitative, others qualitative.  Necessarily, maximizing a plan's performance with respect to one factor (compactness, say) will complicate one's ability to minimize the results of another (*e.g.*, raw political subdivision splits).  In exercising our "equitable discretion" to choose one plan from an array of options, [28] this Court's first responsibility is to ensure that a given plan satisfies the constitutional requirements of equal population, contiguity, compactness, and preservation of political subdivisions.  As others have noted, using the 2018 Remedial

---

[27]     *See* https://www.redistricting.state.pa.us/Maps/.

[28]     *Connor*, 431 U.S. at 415.

Plan as a baseline, each of the submitted maps arguably satisfies these neutral criteria.[29]

This is a good problem to have, as it appears that the days of "Goofy kicking Donald

Duck" are over.[30] Given that reality, our inquiry must turn to other considerations.

Some would have us look immediately to a variety of "partisan fairness" metrics, a

number of which have been scrutinized at length by the parties and their experts.

Respectfully, I see less value in that order of operations. Though I reaffirm the proposition

> that there exists the possibility that advances in map drawing technology
> and analytical software can potentially allow mapmakers, in the future, to
> engineer congressional districting maps, which, although minimally
> comporting with these neutral 'floor' criteria, nevertheless operate to unfairly
> dilute the power of a particular group's vote for a congressional
> representative,[31]

I also bear in mind that we are in a fundamentally different posture than when we

recognized the justiciability of partisan gerrymandering claims in *LWV II*. Because that

case began as a challenge to an existing map that had been drawn by the Legislature

and signed into law by the Governor, the litigants had the benefit of six years' worth of

election data by which to analyze that plan's actual performance. While we found those

---

[29] Majority Op. at 27-33; Concurring Op. (Dougherty, J.) at 2; *see* Report at 192 ("On their face, . . . all the maps in the proposed plans contain districts that are comprised within a contiguous territory and comply with the 'contiguity' requirement of the Pennsylvania Constitution."); *id.* ("Each and every proposed plan satisfies the command in the Free and Equal Elections Clause that congressional districts be created 'as nearly equal in in population as practicable.'"). Among the submissions, the Khalif Ali *Amici* Participants alone utilized the Legislative Reapportionment Commission's alternative, prisoner-adjusted data set. While this choice is not disqualifying, it makes comparing *Amici*'s plan to the other submissions somewhat more difficult. Absent a claim that such adjustments constitutionally are required, which *Amici* do not advance here, whether to use the prisoner-adjusted data set is a policy decision reserved to the discretion of policymakers.

[30] *See LWV II*, 178 A.3d at 819 (relating the derisive moniker given to Congressional District 7 in the 2011 Plan).

[31] *Id.* at 817.

computations to be instructive, we did not need to rely on them in striking down the 2011 Plan because its subordination of the neutral redistricting criteria was manifest, particularly with regard to the compactness criteria. Here, by contrast, we do not confront a challenge to an existing map. Consequently, the partisan fairness metrics used to evaluate the thirteen submitted maps are useful heuristics to approximate partisan outcomes under conditions that have never occurred—*i.e.*, elections held under proposed lines. For that reason, I caution against surrendering to the allure of those metrics at the front end of an analysis. The numbers are no doubt helpful to a comprehensive examination, but they must not be dispositive. They serve better as a gut-check at the culmination of the process, rather than as a gatekeeping function at the start.

Aside from partisan fairness, in *LWV II*, "[w]e recognize[d] that other factors have historically played a role in the drawing of legislative districts, such as the preservation of prior district lines, protection of incumbents, or the maintenance of the political balance which existed after the prior reapportionment."[32] We designated these factors as "wholly subordinate to the neutral criteria" identified above, but available for consideration nonetheless.[33] I find inquiries about incumbent "protection" and maintaining "political balance" to be less appropriate or amenable to objective analysis in the context of a court-

---

[32]    *Id.*; *cf. Holt v. 2011 Legislative Reapportionment Comm'n*, 67 A.3d 1211, 1235 (Pa. 2013) ("*Holt I*") (explaining that, as a constitutional matter, "there is nothing at all to prevent a particular reapportionment commission from considering political factors, including the preservation of existing legislative districts, protection of incumbents, avoiding situations where incumbent legislators would be forced to compete for the same new seat, *etc.*, in drawing new maps to reflect population changes, . . . so long as they do not do violence to the constitutional constraints" expressed in the neutral criteria); *Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (identifying "preserving the cores of prior districts" to be a "legitimate objective").

[33]    *Id.*

drawn or court-selected map. Preserving prior district lines, however, readily can be assessed using straightforward quantitative metrics. Accordingly, I agree with Justice Dougherty's sentiments that, compared to the other subordinate historical considerations, what courts have referred to in modern parlance as the "least-change" approach offers several virtues for a court engaged in the selection of a plan.[34]

For one thing, the least-change approach constrains the Court's exercise of its "equitable discretion," limiting the amount of judicial tinkering with existing district lines to the degree necessary to bring a malapportioned plan into compliance with constitutional requirements. For another, prioritizing least-change promotes "continuity for the vast majority of Pennsylvania residents,"[35] curbing the tumult that might ensue with an indiscriminate overhaul of existing districts. Furthermore, least-change offers a few objective measurements by which to compare competing submissions head-to-head. The "preeminent" metric for a least-change analysis is "core retention," which can be derived by comparing the existing district boundaries to the proposed district boundaries and then calculating the share of the population that would be retained in the overlapping portions.[36] The larger the percentage, the better a plan performs on the core retention metric. Alternatively, one can calculate a "displacement score" by identifying the share

---

[34]     *See* Concurring Op. (Dougherty, J.) at 3.

[35]     *Id.* at 4.

[36]     *Johnson v. Wis. Elections Comm'n*, ___ N.W.2d ___, 2022 WL 621082, *4, *7 (Wis. March 1, 2022) ("Core retention represents the percentage of people on average [who] remain in the same district they were in previously. It is thus a spot-on indicator of least change statewide, aggregating the many district-by-district choices a mapmaker has to make. Core retention . . . is central to a least change review.").

of the population in each proposed district that was not in the prior district, with smaller numbers indicating superior performance.[37]

On the core-retention metric, the submitted plans perform as follows:[38]

**Table 1: Retained Population Share in 14 Submitted PA Congressional Plans**

| Plan | Retained Population Share |
|---|---|
| Carter | 86.6 |
| CCFD | 76.1 |
| Citizen Voters | 82.4 |
| HB2146 | 78.5 |
| Draw the Lines PA | 78.8 |
| GMS | 72.8 |
| Governor Wolf | 81.2 |
| Ali | 81.5 |
| PA House Dem. Caucus | 73.3 |
| Reschenthaler 1 | 76.5 |
| Reschenthaler 2 | 76.5 |
| Senate Dem. Plan 1 | 72.5 |
| Senate Dem. Plan 2 | 72.5 |
| Voters of PA | 80.6 |

With a Retained Population Share of 86.6%, the Carter Plan significantly exceeds most submitted plans on this metric, with only the Citizen-Voters Plan coming within 5%. When asked at argument what significance should be given to these percentages, counsel for

---

[37]    In *Johnson*, the Wisconsin Supreme Court rejected the state legislature's argument that the Court "should weigh as a measure of least change the total number of counties and municipalities split under each proposal." *Id.* The Majority "fail[ed] to see why this [wa]s a relevant least-change metric," in light of the fact that "[i]f a municipality was split under the maps adopted in 2011, reuniting that municipality now—laudable though it may be—would produce more change, not less." *Id.* Although the Court suggested that "[p]articularized data about how many counties or municipalities remain unified or split may be a useful indicator of least change," it did not evaluate the proposed plans on that basis because none of the parties "saw fit to provide that data." *Id.* (emphasis in original). Similar data were not submitted in this case either.

[38]    *See* Carter Petitioners' Response Br. in Support of Proposed Congressional Redistricting Plan, 1/26/2022, Ex. 1 (Expert Report of Jonathan Rodden, 1/26/2022, at 2).

the Carter Petitioners explained that the difference between 86% and 76% on this measurement is roughly one million more people who would remain in their current districts. Broken down by district, eleven of the seventeen proposed districts in the Carter Plan have core retention scores exceeding 89%:[39]

**Table 3: Share of Population in Each Proposed District that Will be in the Same District as in the 2018 Plan**

| District | Share of population in previous version of district |
|---|---|
| 1 | 93.26% |
| 2 | 95.84% |
| 3 | 94.17% |
| 4 | 81.65% |
| 5 | 89.74% |
| 6 | 98.44% |
| 7 | 90.56% |
| 8 | 92.10% |
| 9 | 65.54% |
| 10 | 96.20% |
| 11 | 96.91% |
| 12(18) | 85.50% |
| 13 | 73.39% |
| 14 | 75.65% |
| 15 | 59.61% |
| 16 | 89.95% |
| 17 | 93.63% |

As the Governor's expert put it, the Carter Plan "just laps [the] field when it comes to least change."[40]

In criticizing the Carter Plan, the Special Master erroneously contended that this Court rejected the least-change approach in *Holt I*, and therefore the Carter Plan was

---

[39]     Carter Petitioners' Br. in Support of Proposed Congressional Redistricting Plan, 1/24/2022, Ex. 1 (Expert Report of Jonathan Rodden, 1/24/2022, at 3).

[40]     Notes of Testimony, 1/27/2022, at 409 (testimony of Moon Duchin, Ph.D.).

"developed in contravention of controlling precedent."[41] But least-change was not at issue in that case. Read in context, the cited passage concerned this Court's standard and scope of review of the Legislative Reapportionment Commission's 2011 Final Plan. The Commission argued that the Court's "*de novo* review is to be constrained by the specifics of prior reapportionment plans 'approved' by the Court."[42] That was so because the Commission mistakenly believed that this Court's prior redistricting decisions essentially pre-approved certain raw numbers of split political subdivisions and population deviation levels.[43] In rejecting that approach, the Court clarified that those prior appeals only resolved challenges actually raised by the parties; they did not "insulate" the Commission's Final Plan "from attack . . . unless a materially indistinguishable challenge was raised and rejected in those decisions."[44]

Here, the Carter Petitioners do not suggest that the bulk of the 2018 Remedial Plan must be blindly re-adopted because it previously was approved by this Court. Rather, they believe that it is a reasonable starting point for drawing a new plan that also complies with all other traditional criteria. I agree. Moreover, preferring the least-change approach would not inoculate future plans from challenges, as the Special Master evidently feared.[45] The political branches are not bound by a least-change approach

---

[41]     Report at 187 (citing *Holt I*, 38 A.3d at 735).

[42]     *Holt I*, 38 A.3d at 735.

[43]     *Id.*

[44]     *Id.* at 736; *see also id.* at 735 (explaining that "prior 'approvals' of plans do not establish that those plans survived not only the challenges actually made, but all possible challenges").

[45]     *See* Report at 188 ("This Court is deeply troubled by the prospect of any court, let alone a court of this Commonwealth, applying the 'Least Change' doctrine, where the (continued…)

when drawing districts through the typical legislative process. The United States and Pennsylvania Constitutions give the General Assembly ample latitude to draw new maps from scratch based upon its preferred policy considerations, limited only by constitutional constraints and federal statutes such as the Voting Rights Act. Thus, the Legislature may replace wholesale the Carter Plan with a plan of its own devising in a future redistricting cycle, and any challenges to that plan would have to be evaluated independently on their merits.

To be sure, the least-change approach has its own shortcomings. The utility of such an approach might be diminished significantly if our point of reference—*i.e.*, the thing to be changed the least—is a grossly gerrymandered map, as was the case with the 2011 Plan, whose deficiencies were pervasive. In that instance, it would not have been prudent to require mapmakers to measure their proposals against manifestly unconstitutional lines.[46]

Although I would not declare that least-change should be *the* "tie-breaker" for all court-selected plans, my views on this subject align more closely with Justice Dougherty's.[47] In exercising our constitutional and equitable powers, we must recognize

---

existing plan was drafted by that court itself, because that court could theoretically continuously adopt features of its prior plans, effectively rendering impossible any future challenge to the plan.").

[46] That being said, utilizing a least-change approach where a prior map's constitutional shortcomings are confined to a few districts is not beyond the realm of possibility. In that case, all other things being equal, least-change might still present the most restrained approach to judicial selection among several proposed maps.

[47] *See* Concurring Op. (Dougherty, J.) at 3 ("In my view, the critical factor that sets the Carter Plan apart—the 'tie-breaker,' so to speak—is that the Carter Plan yields the least change from the Court's 2018 congressional redistricting plan.").

that redistricting is more art than science. Every line reflects a value judgment to some community or individual. Nonetheless, we should endeavor to resolve redistricting disputes by elevating as many "objective" criteria above "subjective" considerations as possible. To that end, I consider a plan's least-change score to be a weighty plus-factor that parties to future impasse litigation would be wise to keep in mind when submitting plans for selection by a court. Given that the other plans before us largely satisfy the threshold neutral criteria, the Carter Plan's superior performance on the least-change metric weighs heavily in its favor. For that reason, I join the Court in adopting it as the Commonwealth's 2022 Congressional Redistricting Plan.